278 S.W.3d 305 (2008)
In re R.L.F.
No. M2008-00050-COA-R3-PT
Court of Appeals of Tennessee, Middle Section, at Nashville.
June 9, 2008 Session.
July 31, 2008.
Permission to Appeal Denied by Supreme Court October 17, 2008.
Published Pursuant to Tenn. R. S. Ct. 4(D).
*309 Robert L. Huskey, Manchester, Tennessee, for the appellant, W.L.F.
Peter Trenchi, Sewanee, Tennessee, for the appellant, K.R.F.
Robert E. Cooper, Jr., Attorney General and Reporter, and Amy T. McConnell, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

OPINION
FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.
Mother and Father appeal the trial court's termination of their parental rights. The trial court terminated Mother's parental rights on the ground of abandonment by failure to support. The trial court terminated Father's rights on the ground of being sentenced to more than two years' imprisonment for child abuse pursuant to Tenn.Code Ann. § 36-1-113(g)(5). Additionally, both parents' rights were terminated on the ground of substantial noncompliance with the permanency plan. The trial court also found that termination of both parents' parental rights was in the child's best interests. We affirm the trial court's termination of Father's parental rights based upon his substantial noncompliance with the permanency plan and the best interests of the child. However, we have determined that the order terminating Mother's parental rights must be vacated because the record does not contain clear and convincing evidence that the Department made reasonable efforts to reunite Mother with the child or that Mother abandoned the child by failure to support.
The child, R.L.F., first came to the attention of the Department of Children's Services in September of 2005, at the age of eight, when the Department received a referral alleging that the child was suffering from environmental neglect due to not being fed, eating out of trash cans, and going to school dirty. The investigation of these referrals revealed that the child was currently living with his half-sister Daphne Moore due to Mother's incarceration. The investigation also revealed that prior to living with his half-sister, he had been living with Mother and Father in a trailer that had no electricity and overwhelmingly smelled of kerosene. The trailer also lacked food, pots and pans, toiletries, and clothes.
Shortly after receiving the first referral, the Department received a second referral alleging that the child had been sexually abused by Father. Father had pled guilty fifteen years earlier, and before the child was born, to aggravated sexual battery of *310 the child's half-brother and was sentenced to ten years in jail. As a result of this second referral, an order was entered prohibiting Father from having contact with the child. However, less than three weeks later, Child Protective Services observed the child with Father in violation of the no-contact order, and the Department petitioned for protective custody. The child entered the Department's custody pursuant to a protective custody order entered on November 3, 2005, and was placed with a foster family, where he currently remains.
On March 22, 2006, the child was adjudicated dependent and neglected. The parents stipulated that their home was neither safe nor stable for the child. Moreover, the trial court found that domestic violence between the parents contributed to the child's dependency and neglect. The court reserved its finding regarding the sexual abuse allegations and ordered the parties to submit briefs regarding whether the Department had carried its burden in proving allegations of sexual abuse. The Department never further pursued proving these allegations.
The Department staffed the child's first permanency plan on November 16, 2005. The goal of the initial plan was reunification with parents or relative custody. To achieve the desired outcomes outlined in the plan, Mother and Father were required to have all necessary utilities in working order in their home, to have a mental health intake, and to follow all recommendations of the intake. The plan listed the expected achievement date for the parents' actions as November 16, 2006.
A second permanency plan was staffed on July 12, 2006, with the revised goal of adoption as an alternative to and in addition to the goal of reunification. The plan listed four outcomes for the parents: (1) Mother and Father will have a stable home; (2) Mother's mental health needs will be met; (3) Father's mental health needs will be met; and (4) Mother and Father will have a legal source of income. In order to achieve the desired outcomes, the plan outlined actions to be taken by Mother and Father, including finding housing with adequate space for themselves and the child, having mental health intakes and following all recommendations, and having a legal source of income to provide for themselves and the child. Additionally, this second plan added the requirement that Father participate in a sex offender program.
In October 2006, a permanency hearing was held, and Mother and Father were found to not be in substantial compliance with the permanency plan. The child was ordered to remain in foster care at that time. Mother and Father had made virtually no progress towards regaining custody of the child as required by the permanency plan.
It is clear from the record that Mother has a long history of significant psychological and mental health problems. Mother admitted herself into Moccasin Bend Mental Health Institute in October and November of 2005. During the first admission, Mother reported hearing voices and seeing dead people. She was initially diagnosed with Major Depression with Psychotic Feature, and upon her release, was diagnosed with Borderline Personality Disorder. During her second admission, Mother reported suicidal thoughts, depression, anxiety, and visual and auditory hallucinations. She was diagnosed with Phase of Life Problem and Borderline Personality Disorder with Inadequate Traits.
Mother and Father first underwent the plan-ordered mental health evaluations on February 22, 2007, with Mr. Tim K. McConkey. Mr. McConkey reported that Mother is dependent emotionally on Father *311 and that her mental instability in general is a considerable issue. Moreover, he reported that Mother possesses limited intellectual resources and has cognitive distortions that create huge barriers for traditional treatment. As to Father, Mr. McConkey reported that Father is a deceptive individual and cannot accept culpability for an offense for which he has already spent time in prison.
The Department filed a Petition to Terminate Parental Rights of Mother and Father on February 27, 2007, on the grounds of abandonment by willful failure to support and failure to establish a suitable home, persistent unremedied conditions, and substantial noncompliance with the permanency plan. The Department also alleged that Father had previously been sentenced for child abuse. The petition also alleged termination was in the child's best interest.
Two months after the petition was filed, a third and final permanency plan was staffed in April of 2007. This plan changed the goal to adoption, but Mother's and Father's requirements remained unchanged.
On December 10, 2007, the trial court terminated Mother's and Father's parental rights. The court found by clear and convincing evidence that both Mother and Father were in substantial noncompliance with the permanency plans, that Mother had abandoned the child by willfully failing to pay child support in the four months prior to the filing of the petition, and that Father committed severe child abuse in that he had been sentenced to ten years in prison for aggravated sexual battery perpetrated against the child's half-brother. Both parents timely appealed the trial court's determination.

ANALYSIS
Parents have a fundamental right to the care, custody and control of their children. Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Hawk v. Hawk, 855 S.W.2d 573, 577 (Tenn. 1993). This right is superior to the claims of other persons and the government, yet it is not absolute. In re S.L.A., 223 S.W.3d 295, 299 (Tenn.Ct.App.2006).
Parental rights may be terminated only where a statutorily defined ground exists. Tenn.Code Ann. § 36-1-113(c)(1); Jones v. Garrett, 92 S.W.3d 835, 838 (Tenn. 2002); In re M.W.A., 980 S.W.2d 620, 622 (Tenn.Ct.App.1998). The petitioner has the burden of proving that there exists a statutory ground for termination, such as abandonment or failing to remedy persistent conditions, that led to the removal of the child. Tenn.Code Ann. § 36-1-113(c)(1); Jones, 92 S.W.3d at 838. Only one ground need be proved, so long as that ground is proved by clear and convincing evidence. See In re D.L.B., 118 S.W.3d 360, 367 (Tenn.2003). In addition to proving one of the grounds for termination, the petitioner must prove that termination of parental rights is in the child's best interest. Tenn.Code Ann. § 36-1-113(c)(2); In re F.R.R., 193 S.W.3d 528, 530 (Tenn. 2006); In re A.W., 114 S.W.3d 541, 544 (Tenn.Ct.App.2003); In re C.W.W., 37 S.W.3d 467, 475-76 (Tenn.Ct.App.2000) (holding a court may terminate a parent's parental rights if it finds by clear and convincing evidence that one of the statutory grounds for termination of parental rights has been established and that the termination of such rights is in the best interests of the child). Therefore, a court may terminate a person's parental rights if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn.Code Ann. § 36-1-113(c); In *312 re Adoption of A.M.H., 215 S.W.3d 793, 810 (Tenn.2007); In re Valentine, 79 S.W.3d 539, 546 (Tenn.2002).
Whether a statutory ground has been proved by the requisite standard of evidence is a question of law to be reviewed de novo with no presumption of correctness. In re B.T., No. M2007-01607-COA-R3-PT, 2008 WL 276012, at *2 (Tenn.Ct.App. Jan.31, 2008) (no Tenn. R.App. P. 11 application filed) (citing In re Adoption of A.M.H., 215 S.W.3d at 810).

GROUNDS FOR TERMINATION OF FATHER'S PARENTAL RIGHTS

A. Substantial Noncompliance
Tennessee Code Annotated § 36-1-113(g)(2) authorizes termination of parental rights for failure to comply with a parenting plan as follows:
(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4; ...
The standards for reviewing termination of parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) have been discussed by the Tennessee Supreme Court in In re Valentine, 79 S.W.3d 539 (Tenn. 2002). In conjunction with terminating a parent's rights on the ground of substantial noncompliance, the trial court must find that the requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." In re Valentine, 79 S.W.3d at 547 (quoting Tenn.Code Ann. § 37-2-403(a)(2)(C)). The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed de novo with no presumption of correctness. Id. at 546.
In order for noncompliance to justify the termination of parental rights, it must be "substantial." In re S.H., No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn.Ct.App. Apr.30, 2008) (no Tenn. R.App. P. 11 application filed). Mere technical noncompliance by itself is not sufficient to justify the termination of parental rights. Id. (citing In re Valentine, 79 S.W.3d at 548). "Noncompliance with requirements in a permanency plan that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parent's custody is not relevant for purposes of Tenn.Code Ann. § 36-1-113(g)(2)." Id. (citing In re Valentine, 79 S.W.3d at 548-49). In addition, the parent's degree of noncompliance with a reasonable and related requirement must be assessed. Id.
The trial court found that Father had not substantially complied with his obligations as set forth in the permanency plan. Specifically, the trial court found Father refused to receive sexual abuse counseling and treatment ordered because of his prior conviction for aggravated sexual battery of a minor. Father, however, contends that the trial court wrongfully terminated his parental rights on the ground of failure to comply with the permanency plan requirements because the requirements were wrongly directed toward the unsubstantiated sexual abuse allegation.
Under the permanency plan, Father was to (1) find housing with adequate space for the child, (2) have housing with the appropriate utilities to provide for basic needs, (3) undergo a mental health intake, (4) follow all recommendations of the mental health intake, (5) participate in a sex offender program, and (6) have a legal source of income.
*313 The child was originally removed from the parents as a result of the family's deplorable living conditions. This fact, along with other information indicating that the parents needed mental health counseling or treatment, justified five of the six requirements of the permanency plan. Soon after the Department took custody of the children, allegations that Father may have sexually abused the parties' child came to light. This information combined with the fact that Father had a prior conviction of aggravated sexual battery of another of his children, the child's older half-sibling, fully justified the requirement that Father participate in sexual offender counseling. Accordingly, we find the requirements were reasonable.
The record clearly and convincingly supports the trial court's finding that Father failed to substantially comply with the requirements of any of the permanency plans. Father failed to obtain appropriate housing; to the contrary, he moved into a shelter, was then homeless for a period of time, and at the time of trial he and Mother lived in a one-bedroom hotel room. Moreover, Father failed to undergo counseling, and he refused to participate in a sex offender program.
Given the facts and circumstances of this case, we find the Department acted reasonably by requiring Father to attend sexual offender counseling, and it is undisputed that Father failed, indeed, refused to participate in counseling or the sex offender program.
Although not admitting that he failed to substantially comply with the permanency plans, Father contends that the Department failed in its obligation to make reasonable efforts to assist Father in the reunification effort, which excuses him of any failure to comply with the plan. The Department has an affirmative duty to make "`reasonable efforts' to preserve, repair, or restore parent-child relationships whenever reasonably possible." In re C.M.M., No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *6 (Tenn.Ct.App. Mar.9, 2004). The affirmative duty to make reasonable efforts, however, is not solely on the Department. The duty to make reasonable efforts is "a two-way street." State of Tennessee, Dep't of Children's Servs. v. S.M.D., 200 S.W.3d 184, 198 (Tenn.Ct.App.2006). Thus, Father had a corresponding duty to communicate with the Department and to actively cooperate in those efforts. See Id.
Father testified that he told the caseworker he did not need to attend the sexual offender class because his prior guilty plea had been "so long ago." The caseworker testified that she talked with Father about attending sexual offender treatment and counseling, but he was not even willing to discuss it. Father's emphatic refusal to participate in sex offender treatment or counseling is supported by Mr. McConkey's report, which states that Father refused to accept culpability for the actions to which he pled guilty. Accordingly, the record clearly establishes that Father rejected the Department's efforts to assist him in receiving sexual offender treatment and counseling. By refusing to participate in counseling and treatment, which was a reasonable requirement given his conviction for aggravated sexual battery of his older child, Father failed to uphold his duty to actively cooperate with the Department's efforts. We therefore find that Father's actions excused the Department of any duty to exert future efforts to reunify Father and the child, and we affirm the trial court's finding that Father's noncompliance with the parenting plan was substantial.
Father also argues on appeal that the trial court erred in terminating his parental *314 rights on the ground of being sentenced to more than two years imprisonment for child abuse pursuant to Tenn.Code Ann. § 36-1-113(g)(5). The statute provides that termination of a parent's rights may be based upon any one of several grounds. One of the grounds reads:
(5) The parent or guardian has been sentenced to more than two (2) years' imprisonment for conduct against the child who is the subject of the petition, or for conduct against any sibling or half-sibling of the child or any other child residing temporarily or permanently in the home of such parent or guardian, that has been found under any prior order of a court or that is found by the court hearing the petition to be severe child abuse, as defined in § 37-1-102(b)(21). Unless otherwise stated, for purposes of this subdivision (g)(5), "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian; ...
Tenn.Code Ann. § 36-1-113(g)(5). Father was convicted of aggravated sexual battery of one of his children for which he was sentenced to ten years in prison. Thus, the ground under Tenn.Code Ann. § 36-1-113(g)(5) was established; however, as with any ground for termination, the Department has to establish by clear and convincing evidence that termination of Father's parental rights is in the child's best interests.

The Child's Best Interests
Having concluded the Department established a ground for termination, and realizing that only one ground need be established, see Tenn.Code Ann. § 36-1-113(c)(1); In re D.L.B., 118 S.W.3d 360, 367 (Tenn.2003); Jones v. Garrett, 92 S.W.3d 835, 838 (Tenn.2002); we now consider whether the Department has established the second essential element, that being whether termination of the parent's rights is in the child's best interests. See Tenn.Code Ann. § 36-1-113(c)(2); In re A.W., 114 S.W.3d 541, 545 (Tenn.Ct.App. 2003); In re M.W.A., Jr., 980 S.W.2d 620, 622 (Tenn.Ct.App.1998).
In determining whether termination of parental rights is in the best interests of the child, the court shall consider, but is not limited to, the following:
(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parents or guardians home is healthy and safe, whether there is criminal *315 activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.
Tenn.Code Ann. § 36-1-113(i). The foregoing list is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interests. See In re S.L.A., 223 S.W.3d 295, 301 (Tenn.Ct.App. 2006) (citing State of Tennessee Dep't of Children's Servs. v. T.S.W., No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn.Ct.App. May 10, 2002); In re I.C.G., No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn.Ct.App. Oct.31, 2006)).
The trial court found that termination of Father's parental rights was in the best interests of the child for a number of reasons, including the fact that Father has "not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in [the parents'] home" and the Department has "made numerous attempts for [Father] to receive the necessary and required counseling, but that [Father] simply refused to participate in the counseling." The trial court also found that "a change of caregivers at this stage of the child's life will have a detrimental effect on the child" due to the fact that "[t]he child has done much better in school since being removed from his parents' home" and that "the child is afraid to live in the home with [Father]." These findings are fully supported by the record.
The child has been in a loving and stable foster home since he was taken into custody over two-and-a-half years ago. Father still does not have a stable home and has refused to address his obvious need for counseling and therapy. Having analyzed the child's best interests as viewed from the perspective of the child rather than the parent, see White v. Moody, 171 S.W.3d 187, 194 (Tenn.Ct.App.2004), we have concluded that the record establishes by clear and convincing evidence that the termination of Father's rights is in the best interests of the child.

GROUNDS FOR TERMINATION OF MOTHER'S PARENTAL RIGHTS

A. Substantial Noncompliance
The trial court made the finding that Mother was in substantial noncompliance with the permanency plan, a ground for which her parental rights could be terminated. Mother does not dispute the trial court's finding that she was in substantial noncompliance with the permanency plan. She contends, however, that the trial court erred in finding that the Department made reasonable efforts to implement the goals of the permanency plans. For this reason, Mother contends the trial court's finding that she failed to substantially comply with the permanency plans should be vacated.
Termination on the ground of substantial noncompliance with the permanency plan implicates the Department's obligation to demonstrate that it made reasonable efforts to reunite a child with his parent. Tenn.Code Ann. § 37-1-166(b). Where the Department seeks to terminate parental rights on a ground that implicates the Department's obligation to use reasonable efforts to make it "possible for the *316 child to return safely to the child's home," Tenn.Code Ann. §§ 37-1-166(a)(2), -166(g)(2), those reasonable efforts must be proved by clear and convincing evidence. In re B.B., No. M2003-01234-COA-R3-PT, 2004 WL 1283983, at * 9 (Tenn.Ct. App. June 9, 2004) (citing In re C.M.M., 2004 WL 438326, at *7-8). Thus, the Department had the burden to prove by clear and convincing evidence that it exercised reasonable care and diligence to provide services reasonably necessary to meet Mother's needs to assist her to fulfill her obligations under the permanency plans. In re Valentine, 79 S.W.3d at 546; In re C.M.M., 2004 WL 438326 at *8; Tenn. Code Ann. § 36-1-113(c). This burden required that the Department present sufficient evidence to enable us to conclude, without serious or substantial doubt, that the efforts were reasonable under the circumstances. In re Valentine, 79 S.W.3d at 546; In re C.D.B., 37 S.W.3d 925, 927 (Tenn.Ct.App.2000); see Walton v. Young, 950 S.W.2d 956, 960 (Tenn.1997).
The goals and requirements set forth in permanency plans may not be arbitrary or unreasonable. To the contrary, they must be directed toward remedying the conditions that led to the child's removal from the parent's custody. In re Valentine, 79 S.W.3d at 547; In re M.J.B., 140 S.W.3d 643, 656 (Tenn.Ct.App.2004); In re L.J.C., 124 S.W.3d 609, 621 (Tenn.Ct. App.2003).
"The success of a parent's remedial efforts generally depends on the Department's assistance and support." In re Giorgianna H., 205 S.W.3d 508, 518 (Tenn. Ct.App.2006). Accordingly, the Department's employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the plan. In re Giorgianna H., 205 S.W.3d. at 519; In re J.L.E., No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *14 (Tenn.Ct.App. June 30, 2005); In re C.M.M., 2004 WL 438326, at *7; In re D.D.V., No. M2001-02282-COA-R3-JV, 2002 WL 225891, at *8 (Tenn.Ct.App. Feb.14, 2002). This duty exists even if the parent does not ask for assistance. In re C.M.M., 2004 WL 438326, at *7. The importance of the Department's role in this regard has been emphasized by this court on numerous occasions. In re B.L.C., No. M2007-01011-COA-R3-PT, 2007 WL 4322068, at * 8 (Tenn.Ct.App. Dec.6, 2007) (no Tenn. R.App. P. 11 application filed); In re C.M.M., 2004 WL 438326, at *7 (stating that "[i]n many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support"); In re J.A.W., No. M2007-00756-COA-R3-PT, 2007 WL 3332853, at *4 (Tenn.Ct.App. Nov.8, 2007); In re Randall B., Jr., No. M2006-00055-COA-R3-PT, 2006 WL 2792158, at *5-6 (Tenn.Ct.App. Sept.28, 2006).
Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn.Code Ann. § 37-1-166(g)(1) (emphasis added). The factors the courts are to use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the childrens removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency *317 plan, and the Departments efforts. In re Tiffany B., 228 S.W.3d 148, 158-59 (Tenn.Ct.App.2007) (footnote omitted) (emphasis added) (citing In re Giorgianna H., 205 S.W.3d at 519).
Mother's poor mental health was at the root of her deficiencies as a parent, which was well known to the Department from the beginning of this case. This is evident by the requirements established by the Department in each of Mother's permanency plans. Shortly after the child was taken into the Department's custody, Mother was admitted to a mental health facility. In fact, she was admitted twice within two months, and the Department was aware of both admissions. The psychologist who evaluated Mother at the request of the Department submitted a report to the Department, which stated that Mother is estimated to function in the borderline range of intellectual classification and "possesses limited intellectual resources." Moreover, the psychologist stated that "[t]here is significant evidence that [Mother] is dependent emotionally on [Father] and that her mental instability in general is a considerable issue." Thus, the Department knew that Mother needed substantial assistance if she were to have a chance to accomplish the goals of the per-manency plans. There is, however, no evidence that the needed psychological services were provided.
The record tells us very little about the efforts the Department made to assist Mother in meeting the goals of the permanency plans drafted by the Department. Although the Department is required by statute to provide an affidavit which identifies its reasonable efforts, see Tenn.Code Ann. § 37-1-166(c), there is no such affidavit in the record.[1] Moreover, the transcript of the termination hearing provides only scant traces of evidence that the Department made any efforts to assist Mother to reach the stated goals. The record does reveal that a mental health evaluation was scheduled by the Department, which Mother attended. Unfortunately, Mother did not follow up on the recommendations for further counseling. Although some of the fault for not following through with counseling lies with Mother, it was unreasonable for the case manager to do no more than extend an open invitation for Mother to come back and to use the Department's phone if she so desired.
Our review of the record reveals only one attempt by the Department to assist *318 Mother to obtain the service she needed the most, mental health treatment. What occurred during the Department's only attempt to schedule mental health treatment is not clear, but it appears the caseworker and Mother spent an hour at the Department's office making phone calls to schedule a mental health intake for Mother to obtain treatment. After an hour of attempts to schedule the appointment, a healthcare scheduler whom the caseworker had been talking to by phone insisted on speaking to Mother directly. When advised of this request, Mother became very agitated and refused to talk to the person on the phone. Unfortunately, the Department made no subsequent efforts of any kind to assist Mother to obtain mental health care and, as could be expected, Mother never received the mental health treatment she desperately needed. With the exception of the foregoing, the Department's efforts consisted of little more than giving Mother a list of resources in the community along with an offer to further assist her if she called the Department to ask for help.
More specific to the issue of a parent with known mental health deficiencies, we have repeatedly found that the Department's failure to provide needed psychological or psychiatric treatment constitutes a failure to exercise reasonable efforts. In re A.R., No. M2007-00618-COA-R3-PT, 2007 WL 4357837 (Tenn.Ct.App. Dec.13, 2007) (no Tenn. R.App. P. 11 application filed); State of Tennessee, Dep't of Children's Servs. v. M.R.N. No. M2006-01705-COA-R3-PT, 2007 WL 120038 (Tenn. Ct. App. Jan 17, 2007) (no Tenn. R.App. P. 11 application filed); State of Tennessee, Dep't of Children's Servs. v. Howard, No. W2006-00585-COA-R3-PT, 2006 WL 2257341 (Tenn.Ct.App. Aug.8, 2006) (no Tenn. R.App. P. 11 application filed); State of Tennessee, Dep't of Children's Servs. v. S.V., No. E2006-00686-COA-R3-PT, 2006 WL 1864470 (Tenn.Ct.App. July 6, 2006) (no Tenn. R.App. P. 11 application filed); In re J.L.E., No. M2004-02133-COA-R3-PT, 2005 WL 1541862 (Tenn.Ct.App. June 30, 2005); In re M.E., No. M2003-00859-COA-R3-PT, 2004 WL 1838179 (Tenn.Ct. App. Aug.16, 2004). Unfortunately, the Department has once again failed to provide psychological or psychiatric services reasonably necessary to assist a mentally challenged parent in fulfilling her obligations under the permanency plans. We will discuss two of the above cases to illustrate these deficiencies.
In In re M.E. a mentally challenged mother contended the Department failed to make reasonable efforts at reunification. In re M.E., 2004 WL 1838179, at *10. The trial court ordered the mother to undergo a psychological evaluation. Id. at *2. The evaluation, which was provided to the Department, noted that Mother's mental capacity was limited and the report cited numerous emotional deficiencies. Id. The doctor who evaluated her also recommended that she have "individual psychotherapy with a therapist who is effective in treating dependent personality and its associated problems." Id. The Department, however, failed to provide the services recommended by the doctor. Id. at *3. On appeal, we noted that the Department provided services to the mother, but "the Department failed to provide the most obvious and essential service Mother needed, the mental health services recommended by [the doctor]." Id. at *7. We also noted that "[w]hile the Department provided numerous services, the failure to provide the individualized psychological services, the need for which were most evident from [the doctor's] report, mitigates the beneficial value of the other services provided by the Department and its service providers." Id. at * 10. Based on these facts, we *319 concluded that the Department failed to make reasonable efforts. Id.
In In re A.R. it was most evident from the outset that the Department was concerned with the mother's mental health and mental deficiencies. In re A.R., 2007 WL 4357837, at *2. The first permanency plan expressly required that she receive a psychological assessment. Id. David W. Frensley, M.A., a Senior Psychological Examiner, conducted a psychological evaluation and determined that moderate levels of depression existed and that "Severe Dysthymic character features" existed. Id. at *6. He also made notations regarding the mother's depression, anxiety, and past passive suicidal thoughts, and noted that she is an "odd, peculiar and eccentric individual who lacks basic social skills" and that "[h]er insight is limited with regard to the origin of her behavior, and judgmental deficiencies arise from her lower intellectual functioning, overdependence on others, and limited abstract problem solving skills." Id. Significantly, Mr. Frensley concluded that her mental issues carry over into the relationship with her children, may impair her ability to handle her parenting responsibilities, and that she "reports a high level of psychological distress that would impair her ability to parent her children." Id. Although this report was provided to the Department, the record failed to establish that the needed services were provided. Id. at *7. In fact, three months after receiving the psychological evaluation report, a new case manager was assigned and remained the case manager thereafter, and the Department conceded that the new case manager did very little to assist the mother until after the trial to terminate the mother's parental rights had begun. Id. After considering the scant evidence in the record concerning what if any mental health counseling the mother in In re A.R. received, we concluded that the Department failed to prove that it exercised reasonable care and diligence to provide services reasonably necessary to meeting the mother's needs to assist her to remedy the persistent conditions and to fulfill her obligations under the permanency plans. Id. at *9.
The record before us reveals that the Department did little to assist Mother, other than to assist her with one phone call, provide a list of providers she might contact, and inform her that she could call the Department for assistance. Our courts, however, have rejected the notion that the Department can expect parents to initiate remedial efforts on their own and to ask the case manager for help. See In re Tiffany B., 228 S.W.3d at 160. After concluding that this expectation was "unreasonable," the court stated that the Department may not be passive when it removes children from their parents' custody. Id. The Department must do more than merely provide a list of services to the parent, point them in the right direction, and rely on parents to facilitate their own rehabilitation. In re M.B., No. M2006-02063-COA-R3-PT, 2007 WL 1034676, at *5 (Tenn.Ct.App. Mar.30, 2007) (citing In re Giorgianna H., 205 S.W.3d at 519).
Considering the entire record, we have concluded that the Department failed to establish that it exerted reasonable efforts to provide services reasonably necessary to meeting Mother's needs to assist her to fulfill her obligations under the permanency plans. Because the Department failed to establish that it exerted reasonable efforts to assist Mother in fulfilling her obligations under the permanency plans, we must vacate the trial court's finding that Mother failed to substantially comply with the permanency plan.

*320 B. Abandonment by Failure to Support

The trial court also determined that Mother's parental rights should be terminated on the ground of abandonment by failure to support. A parent abandons his or her child if the parent has "willfully failed to support" or "willfully failed to make reasonable payments toward the support of the child" for a period of four consecutive months immediately preceding the filing of a pleading to terminate the parental rights of the parent. Tenn.Code Ann. § 36-1-102(1)(A)(i). "Willfully failed to support" is statutorily defined as "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn.Code Ann. § 36-1-102(1)(D). "Token support" is where the "support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn.Code Ann. § 36-1-102(1)(B).
A parent's failure to support is "willful" if (1) the parent is aware of his duty to support, (2) has the capacity to provide the support, (3) makes no attempt to provide support, and (4) has no justifiable excuse for not providing the support. In re W.J.R.C, 152 S.W.3d 513, 524 (Tenn. Ct.App.2004) (quoting In re Adoption of Muir, No. M2002-02963-COA-R3-CV, 2003 WL XXXXXXXXX, at *5 (Tenn.Ct.App. Nov.25, 2003)). The element of "willfulness" of a parent's actions hinges on his or her intent, which is usually incapable of direct proof. In re B.P.C., No. M2006-02084-COA-R3-PT, 2007 WL 1159199, at *10 (Tenn.Ct.App. April 18, 2007) (citing In re Audrey S., 182 S.W.3d 838, 864 (Tenn.Ct.App.2005)). Thus, intent must often be inferred from circumstantial evidence drawn from the parent's actions or conduct. In re B.P.C., 2007 WL 1159199, at *10.
Mother does not dispute that she did not make any child support payments in the four months prior to the filing of the petition. Mother contends that her failure to pay support was not willful. We agree.
"A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child." In re M.J.M. Jr., No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *8 n. 17 (Tenn.Ct.App. Apr.14, 2005). During the four months prior to the filing of the petition, Mother worked at a motel in exchange for a room. She also testified that she had a couple "odd jobs" on the side, including collecting aluminum cans, that "pays about $45." It is unclear from the record whether she was earning $45 a day, week or month. The Department's caseworker testified that she never saw any proof of income from either parent other than a couple of recycling receipts. Likewise, the record contains no proof that Mother was gainfully employed or had steady or significant income.[2] Given Mother's untreated mental health needs, it is not surprising that she did not have stable employment.
We also find it significant that none of the permanency plans required Mother to provide financial support to the child, yet, the Department wishes to use her failure to support as a ground for termination. Considering the Department's keen awareness of Mother's mental deficiencies, her *321 "limited intellectual resources," and her mental instability, it begs the question why the Department would stand by quietly as a challenged woman falls into a concealed trap.
Every parent has a duty to support his or her children and, as we held in a similar case, "[w]e do not mean to imply that the juvenile court must order support before a parent incurs this obligation, nor do we imply that the obligation to support a child in [the Department's] custody must be stated in every Permanency Plan." In re S.L.R., No. M2004-01565-COA-R3-PT, 2004 WL 3008888, at *16 n. 8 (Tenn.Ct. App. Dec.28, 2004). However, based on the circumstances in this case, the record falls significantly short of proving by any evidentiary standard that Mother willfully failed to support her child. Accordingly, the Department has failed to prove the ground that Mother abandoned her child by willfully failing to support the child.

C. No Ground Has Been Established Upon Which To Terminate Mother's Rights
Parental rights may not be terminated unless the existence of at least one statutory ground is established and it is further established that termination of the parent's rights is in the best interests of the child. Tenn.Code Ann. § 36-1-113(c); In re Adoption of A.M.H., 215 S.W.3d at 810; Jones v. Garrett, 92 S.W.3d at 838; In re Valentine, 79 S.W.3d 539, 546 (Tenn.2002); In re M.W.A., 980 S.W.2d at 622. The trial court found two grounds upon which to terminate Mother's parental rights. One, that she was in substantial noncompliance with the permanency plan. Two, that she abandoned her child by willfully failing to support the child. We have determined that the Department failed to establish either ground. Accordingly, no ground exists upon which Mother's parental rights may be terminated, and thus, the order terminating Mother's parental rights must be vacated.

IN CONCLUSION
We affirm the termination of Father's parental rights, we vacate the termination of Mother's parental rights, and remand for further proceedings consistent with this opinion with costs of appeal assessed against the Department of Children's Services, due to the parents' indigency.
NOTES
[1] The General Assembly has relieved the Department of its duty to exert reasonable efforts to assist parents from whose homes it has removed their children under certain statutorily defined circumstances. See In re Tiffany B., 228 S.W.3d 148, 157-58 (Tenn.Ct. App.2007). Those circumstances, which are identified as "aggravated circumstances," include when a court of competent jurisdiction has determined that the parent has committed murder, voluntary manslaughter, felony assault, aggravated or especially aggravated kidnapping, aggravated child abuse, aggravated or especially aggravated sexual exploitation of a minor, rape, incest, severe child abuse, or "abandonment," as defined by Tenn.Code Ann. § 36-1-102(1). See Tenn.Code Ann. § 37-1-166(g). In the absence of aggravated circumstances, the Department is under an affirmative duty to make reasonable efforts to reunite the family after removing the child from Mother's care. See Tenn.Code Ann. §§ 37-1-166(a)(2), -166(g)(2); In re M.E., No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *9 (Tenn.Ct.App. Aug.16, 2004); In re C.M.M., No. M2003-01122-COA-R3-PT, 2004 WL 438326 at *7 (Tenn.Ct.App. Mar.9, 2004). None of the aggravated circumstances pertain to Mother's case and thus the Department was not relieved of its affirmative duty to exert reasonable efforts to assist Mother to satisfy her goals under the permanency plans. Therefore, we must ascertain whether the Department has proven that it exerted the requisite reasonable efforts.
[2] The Department contends that Mother's ability to pay is evidenced by her payment of $330 when faced with contempt of court in April of 2007. However, this payment was made after the filing of the petition to terminate Mother's parental rights and there is no proof in the record to support a finding that her failure to pay during the four months preceding the filing of the petition was willful.