IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 25, 2012

# IN RE: MICHAEL B. Q.

**Direct Appeal from the Juvenile Court for Anderson County**
**No. J-26315      Brandon K. Fisher, Judge**

---

**No. E2012-00219-COA-R3-PT - Filed July 12, 2012**

---

This is a termination of parental rights case. Father/Appellant appeals the trial court's termination of his parental rights to the minor child at issue. By clear and convincing evidence, the trial court found two grounds for termination of Father's parental rights: (1) abandonment by an incarcerated parent, and (2) prison sentence of more than ten years, imposed when the child was under the age of eight. The trial court also found, by clear and convincing evidence, that termination of Father's parental rights was in the child's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Juvenile Court Affirmed.**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., and DAVID R. FARMER, J., joined.

Darrell W. Sproles, Knoxville, Tennessee, for the appellant, Michael R.Q.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsey O. Appiah, Assistant Attorney General for appellee, State of Tennessee, Department of Children's Services.

David K. Vander Sluis, Oak Ridge, Tennessee, Guardian Ad Litem.

## OPINION

### I. Background

The minor child, Michael B. Q., was born on October 26, 2003 to

Respondent/Appellant Michael R. Q. ("Father") and Jennifer M.[1] The State of Tennessee Department of Children's Services ("DCS," or "Appellee") first became involved with this child on December 10, 2007, when DCS received a referral, alleging that Michael B. Q. and his half-siblings were living with their mother, Jennifer M., who was allegedly abusing drugs.[2] Following an investigation, on January 8, 2008, DCS filed a petition for temporary custody of the children. On the same day, the children were brought into DCS custody under a protective custody order. On January 23, 2008, the trial court entered an order, finding Michael B. Q. to be dependent and neglected, based, in part, on Father's incarceration, and continued DCS's custody pending further hearing. An adjudicatory hearing was held on February 28, 2008. Thereafter, on March 4, 2008, the trial court entered an adjudicatory order affirming the finding of dependency and neglect. Jennifer M.'s parental rights were terminated in December, 2009.[3]

On May 31, 2011, DCS filed its petition to terminate Father's parental rights. As to Father, DCS alleged that he had abandoned the child pursuant to Tennessee Code Annotated Section 36-1-113(g)(1) because he was incarcerated, as defined in Tennessee Code Annotated Section 36-1-102(1)(A)(iv), and/or because he had willfully failed to either visit or support the child, Tennessee Code Annotated Sections 36-1-102(1)(A)(i), as those terms are defined at Tennessee Code Annotated Sections 36-1-102(1)(B), (C) and (E). DCS further alleged that it was in the child's best interest for Father's parental rights to be terminated. At the time DCS filed its petition, Father was incarcerated at the Northwest Correctional Complex. The record indicates that, in compliance with Tennessee Code Annotated Section 36-1-113(f), Father was served with the petition, and was informed of his rights and of the hearing date. A guardian *ad litem* was appointed to represent the child, and based upon his indigency, a lawyer was also appointed to represent Father.

On May 31, 2011, DCS filed an affidavit of reasonable efforts. The trial took place on November 10 and December 13, 2011. Father was present for the trial. At the hearing, Father testified concerning his criminal history, both before and after the child's birth. In relevant part, Father admitted that he had pled guilty to charges for seven attempted burglaries. He was also convicted for reckless endangerment for shooting a gun out of his

---

[1] In termination of parental rights cases, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] These half-siblings were fathered by another man. He is not a party to this appeal. Accordingly, the adjudication concerning Michael B. Q.'s half-siblings is not the subject of the instant appeal. We note, however, that Michael B. Q. and his half-siblings live together with a foster family that has already adopted the half-siblings.

[3] Father is the sole appellant in the instant appeal.

car into a crowd of people. During this same period, Father admitted that he was selling drugs "everyday," but attempted to justify his actions by testifying that this was the only way he could support his family. In early 2004, Father was arrested for possession of crack cocaine. When asked whether he had considered the possibility that using and/or selling drugs would put him in a position where he could not care for his family, Father admitted that he understood, but conceded that he had decided to do it anyway. On February 18, 2005, Father was sentenced to eleven years for seven attempted burglaries, theft, possession of a Schedule II drug (i.e., crack cocaine), and reckless endangerment. Since that time, he testified that he has appeared before the parole board five times (in 2006, 2008, 2009, and twice in 2011); however, until 2011, all his attempts at early release were unsuccessful. In 2011, he was granted parole conditioned upon his completing a therapeutic-community, in-house program. Father admitted that he did not complete the program because he was ejected from the program for "disrespect."

Father admitted that he has had little contact with the child. After the child was born, Father lived with the child and the mother for approximately six months. Then, for the next four months, he was incarcerated, which incarceration is separate from Father's current incarceration. When he was released from that incarceration, he resided with the child and mother for approximately four months before he began serving his current sentence. At the time of the filing of this appeal, Father was still incarcerated. Without parole, his sentence will not expire until 2015.

As of the date of the hearing, Father testified that he had not seen the child since December 24, 2005. However, he testified that he had written to the child "a few months ago . . . sometime in August [2011] maybe." No letters were introduced into evidence. When asked why he had stopped writing the child in recent months, Father replied "[b]ecause of this whole thing, me being kicked out of that program— it just killed me. I knew I was going to have to come face this [termination hearing] . . . and it hurt me, man, because I let myself down; I let my son down." When asked whether he was a regular user of cocaine, Father testified: "Not bad, no. I used it." When asked to elaborate on what he meant by "not bad," Father stated that he did not use drugs every day, just "[o]ccasionally on the weekends." He also clarified that he "never used crack cocaine. I just snorted it." When asked whether he had addressed his drug use while in prison, Father testified that he had entered drug treatment programs twice in his nearly five years of incarceration; however, he did not finish the program either time because he "got kicked out."

Concerning his contact with DCS while incarcerated, Father testified that he had regular contact with Katie Butler, the DCS case manager, in the form of letters and phone calls. When asked whether Ms. Butler had "helped [Father] understand what it is at the prison that you can do and need to do to work on your permanency plan," he answered that

she had. Specifically, Father stated that Ms. Butler had talked with him about "my permanency plan, me getting out of prison . . . and doing what I need to do to get my son." He further admitted that Ms. Butler had been reminding him that, if he did not comply, his parental rights could be terminated. In fact, when asked if there was anything that he had asked Ms. Butler for, by way of assistance, that she did not provide, Father answered "No." However, when asked what he had done in furtherance of the permanency plans, Father answered that he had done the "only things I can do . . . . I studied for my GED. Got my GED." Father admitted that his failure to complete the in-house program had hurt his efforts for reunification with the child. He admitted that he understood how very important it was for him to complete the program.

Ms. Butler also testified at the hearing. In relevant part, she stated that she had met with Father, "face-to-face," at least quarterly. Every month, Ms. Butler testified that she communicated with Father by mail or by phone. Ms. Butler stated that she and Father discussed the permanency plan requirements and his progress. Moreover, Ms. Butler testified that she had researched what programs were available to Father in the prison, and had informed Father as to her findings. Ms. Butler indicated that the therapeutic community is an "all-in-one" program, which would have helped Father complete the majority of the permanency plan requirements. Aside from this program, Ms. Butler stated that Father could have shown progress on the permanency plan requirements by getting and keeping a prison job, and not getting "written up" for violation of prison rules. In short, Father's requirements under the permanency plan were to abide by the conditions, and to take advantage of all the programs available at the prison so that he could be paroled and, once paroled, to follow his parole regulations. Ms. Butler testified that Father had not availed himself of these opportunities, except that he did complete his GED. In addition, Ms. Butler testified that, in March 2010, Father admitted to her that he had used drugs while incarcerated.

Concerning the child, Ms. Butler testified that he had done well in his foster home, that "[h]e is very happy. He's involved in different activities." Ms. Butler stated that the foster home is "a really warm family environment, very stable . . . [and] very structured." She opined that the child had bonded with his foster parents and noted that he calls them "mommie and daddy." Ms. Butler indicated that the foster parents would petition for adoption if parental rights were terminated.

Following the hearing, DCS moved the court to amend the petition to terminate Father's parental rights to conform with the proof adduced at the hearing. Specifically, DCS argued that facts were admitted that would clearly and convincingly show grounds for termination of parental rights in addition to those specifically alleged in the petition. The additional grounds asserted in the motion to amend the petition were Father's admission that he had been sentenced to confinement in a correctional facility for a period of more than

eleven years and that the child was under the age of eight at the time of incarceration (under Tennessee Code Annotated Section 36-1-113(g)(6)). DCS also averred that the evidence clearly and convincingly showed that Father had failed to substantially comply with the permanency plan (under Tennessee Code Annotated Sections 36-1-113(g)(2)); *see also* Tennessee Code Annotated Section 37-2-403(a)(2)). Father filed an objection to DCS's motion to amend the petition. Although the trial court did not specifically rule on the motion to amend the petition, as discussed below, to the extent that it adopted grounds other than those set out in the original petition, the court did implicitly grant the motion to amend the petition. We note, however, that the trial court did not find the ground of failure to substantially comply with the permanency plan as a basis for termination and, in this regard, it denied DCS's motion to amend the petition to conform with the evidence.

By Order of January 11, 2012, the trial court terminated Father's parental rights to this child on two grounds, both of which were found by clear and convincing evidence: (1) abandonment by incarcerated parent under Tennessee Code Annotated Sections 36–1–113(g)(1) and 36-1-102(1)(A)(iv), as defined at Tennessee Code Annotated Sections 36-1-102(1)(C) and (E); (2) ten-year sentence under Tennessee Code Annotated Section 36–1–113(g)(6). The court further found, by clear and convincing evidence, that termination of Father's parental rights was in the child's best interest.

In accordance with Tennessee Code Annotated Section 36-1-113(k), which requires the court to "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing [on the petition to terminate parental rights], the trial court's order contains the following findings of fact and conclusions of law:

> [T]he Court makes the following findings of fact by clear and convincing evidence. . . .
>
> *                                    *                                    *
>
> [Father] was in jail all of the four months immediately preceding the filing of this Petition. . . . By his own admission through sworn testimony, [Father] was sentenced to more than ten (10) years incarceration. At the time of his sentencing, the child . . . was under the age of eight (8).
> Also, by [Father's] own admission through sworn testimony, he has repeatedly and willfully failed to complete the program necessary to allow him to be paroled; he cannot describe a reasonable period of time in which he would be able to be paroled, secure a job, and secure a safe and suitable home

-5-

to which the child could return. [Father] has made no change in his lifestyle, conduct, or personal circumstances, despite reasonable efforts by the Department to assist him in doing so, and lasting change does not appear possible.

Finally, by [Father's] own admission through sworn testimony, he has admitted that he has had no significant contact with the child during the child's lifetime. The testimony of the Department's case manager corroborates this and it is clear that there is no relationship of any significance whatsoever between [Father] and the child. . . . The child has resided in his foster home for a substantial period of time; has bonded to his foster parents, as they have to him. . . . The child is clearly in a safe, stable, and loving home where he is thriving.

Concerning the child's best interest, the court's findings continue as follows:

In this case, the Court finds that there is clear and convincing evidence that termination of [Father's] parental rights is in the best interest of the child . . . in that [Father] has not made changes to his conduct, circumstances, or lifestyle that would make it safe for the child to go home, despite reasonable efforts by the Department, so that lasting change does not appear possible; [Father] has not maintained regular visitation with the child, not even by letter; there is no meaningful relationship between [Father] and the child; [Father] is unable to provide a home for the child, provide for the child, or care for the child, and there does not appear to be a possibility of this occurring in a reasonable amount of time; the child has established a strong bond with his foster parents, who wish to adopt him, and these foster parents have already adopted the child's half-siblings, with whom the child is closely bonded; and changing caregivers at this state of the child's life will have a detrimental effect on him.

## II. Issues

Father appeals the termination of his parental rights and raises three issues for review, which we restate as follows:

1. Whether the court erred in finding that there was clear and convincing evidence to support the grounds for termination of

-6-

Father's parental rights.

2. Whether the court erred by finding that DCS had provided reasonable efforts in this case.

3. Whether the court erred in finding that termination of Father's parental rights was in the child's best interest.

### III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In light of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We must then determine whether the facts, as found by the trial court or as

supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge who has had the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.*; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997).

## IV. Grounds for Termination of Father's Parental Rights

The trial court found two grounds for terminating Father's parental rights. Only one ground must be proved by clear and convincing evidence to justify termination of parental rights. Tenn. Code Ann. § 36-1-113(c). After reviewing the entire record in this case, however, we conclude that both grounds relied upon by the trial court are established by clear and convincing evidence in the record.

## A. Abandonment by Incarcerated Parent

A court may terminate parental rights when abandonment by the parent or guardian, as defined in Tennessee Code Annotated Section 36-1-102, has occurred. Tenn. Code Ann. § 36-1-113(g)(1). Abandonment occurs when, prior to incarceration, a parent has engaged in conduct that exhibits a wanton disregard for the welfare of the child. Tenn. Code Ann. §36-1-102(1)(A)(iv).

In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), this Court held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and failure to provide adequate support or supervision for a child can, alone, or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id*. at 867–68. All of these factors are present in the instant case. From the record, it is difficult to point to a time in this child's life, during which Father was not incarcerated or engaged in criminal activity. By his own testimony, due to his repeated incarcerations, Father has only resided with his son for approximately ten months of the child's life (the child was eight when the hearing occurred). By his own admission, Father has consistently used drugs and, by Ms. Butler's testimony, continues to do so while in prison.

Although post-incarceration conduct is not contemplated by the foregoing statute, we nonetheless note that Father has continued to engage in negative behaviors that have

foreclosed any possibility of reunification with this child. Although offered the possibility of parole, Father failed to modify his behavior to complete a therapeutic in-house program.

From the totality of the circumstance, clear and convincing evidence exists to support the trial court's finding that Father has abandoned this child.

## B. Sentence Greater than Ten Years

Tennessee Code Annotated Section 36-1-113(g)(6) states that parental rights may be terminated if:

> The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court.

It is undisputed in the record that Father received an eleven year sentence for seven attempted burglaries, a theft, possession of a Schedule II drug (i.e., crack cocaine), and reckless endangerment. This sentence was imposed on or about February 18, 2005. The record establishes that the child was born on October 26, 2003, and that he was under the age of eight at the time Father was sentenced. Therefore, the record contains clear and convincing evidence in the record to support termination of Father's parental rights on this ground.

## C. Amendment of Petition to Terminate to Conform with the Evidence.

From Father's brief, it appears that he also asserts that, because the trial court relied upon a ground for terminating his parental rights that was not in the original petition—a fact that led DCS to file a motion to amend the pleadings to conform with the evidence, he was somehow denied due process in this case. We respectfully disagree. "Because a parent's right to the care, custody, and control of his [or her] child is a fundamental constitutional liberty interest, he [or she] is guaranteed certain procedural protections when the State seeks to abridge that interest." *See* ***State, Dept. of Children's Services v. Mims***, 285 S.W.3d 435, 450 (Tenn. Ct. App. 2008) (relying on ***Troxel v. Granville***, 530 U.S. 57, 65–66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)).

Here, Father was represented by a court-appointed lawyer throughout these proceedings. The record further establishes, and there is no dispute, that Father received notice of all hearings in this case. In these regards, Father's due process rights were protected by the trial court. Likewise in ***State, Dept. of Children's Services v. Mims***, 285

S.W.3d 435 (Tenn. Ct. App. 2008), following testimony in a parental termination case, DCS moved to amend the pleadings to assert the ground of mental incompetency, Tennessee Code Annotated Section 36-1-113(g)(8). *Id.* at 440. The trial court allowed the amendment and terminated the father's parental rights based, in part, on the father's mental incompetence. *Id.* at 441. On appeal, the father argued that the trial court, in allowing the amendment, had violated his due process rights. *Id.* at 447. This Court affirmed the trial court and held that because the father was appointed a capable attorney, had adequate notice of the termination proceedings, and was present at the hearings, the father's due process rights had not been violated. *Id.* at 449–50.

Here, Father was represented by a court-appointed lawyer throughout these proceedings, and was physically present during the two-day trial of this cause. The record further establishes, and there is no dispute, that Father received notice of all hearings in this case. In these regards, Father's due process rights were protected by the trial court. *See Mims*, 285 S.W.3d at 449–50. Although the additional ground relied upon for termination of Father's parental rights was not contained in the original petition to terminate, from our review of the record, evidence supporting this ground was introduced at the hearing without objection by Father's lawyer. We have often stated that failure to object during the trial constitutes a waiver of the issue on appeal. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). In addition to not objecting to the evidence at the trial, it does not appear that Father otherwise raised the issue of his due process rights in the trial court. We will usually decline to address the merits of an issue not raised in the proceedings below. *Mims*, 285 S.W.3d at 449–50 (relying on *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983)). As set out in Tennessee Rule of Civil Procedure 15.02:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues . . . .

For all of the foregoing reasons, we conclude that the trial court did not err in relying upon a ground not specifically set out in the original petition as evidence supporting this ground was introduced at the hearing and tried without objection. Moreover, from our review of the record, Father's due process rights were not otherwise violated in these

proceedings.

## D. Reasonable Efforts.

The decision to pursue a termination of parental rights on the grounds of abandonment, persistence of conditions and/or substantial noncompliance generally invokes DCS's statutory duty to make reasonable efforts to facilitate the safe return of a child to the child's home. *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008) (citing Tenn. Code Ann. § 37-1-166(b), -166(a)(2), -166(g)(2)); *see also In re Tiffany B.*, 228 S.W.3d 148, 151, 160 (Tenn. Ct. App. 2007) (vacating a finding of abandonment, substantial noncompliance, and persistence of conditions for failure to make reasonable efforts). The statutory duty to make reasonable efforts includes an obligation to exercise "'reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family.'" *In re R.L.F.*, 278 S.W.3d at 316 (emphasis omitted) (citing Tenn. Code Ann. § 37-1-166(g)(1)). Courts evaluate the reasonableness of DCS's efforts in consideration of the following factors:

> (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B.*, 228 S.W.3d at 158–59 (footnote omitted) (citing *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)). Courts should decide the reasonableness of DCS's efforts "on a case-by-case basis in light of the unique facts of the case." *In re Bernard T.*, 319 S.W.3d 586, 601 (Tenn. 2010) (citing *In re J.C.D.*, 254 S.W.3d 432, 446 (Tenn. Ct. App. 2007)). The burden is on DCS to prove clearly and convincingly the reasonableness of its efforts. *In re R.L.F.*, 278 S.W.3d at 316 (citing *In re B.B.*, No. M2003-01234-COA-R3-PT, 2004 WL 1283983, at *9 (Tenn. Ct. App. June 9, 2004)).

The exercise of reasonable efforts is important because "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H.*, 205 S.W.3d at 518 (citations omitted). DCS employees must affirmatively and reasonably use their education and training to help a parent eliminate the conditions requiring removal of his or her children and to meet the responsibilities of his or her

permanency plans before courts will terminate the parent-child relationship. *In re R.L.F.*, 278 S.W.3d at 316. DCS's duty to affirmatively assist parents exists even if the parents do not seek assistance. *Id*. (citing *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. March 9, 2004)).

The legislature, however, did not place the burden to reunify parent and child on DCS's shoulders alone. *See State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008). Reunification "is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents." *In re Tiffany B*., 228 S.W.3d at 159 (citations omitted). "Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody." *Id.* Once services have been made available, parents must make reasonable efforts to rehabilitate themselves. *Id*. The reasonableness of DCS's efforts should be decided on a case-by-case basis in light of the unique facts of the case. *Id*.

In this case, the trial court expressly found that DCS had made reasonable efforts to assist Father. The proof at trial supports this conclusion. By Father's own testimony, he had regular contact with the case manager, Ms. Butler, while he was in prison. Either by phone, mail, or face-to-face contact, Ms. Butler kept Father apprised of his requirements. Moreover, Ms. Butler testified that she informed Father of the programs available to him in the prison. Father conceded that Ms. Butler had never denied him assistance and that she had been helpful and forthright during these proceedings. However, Father admitted that he had not been able to complete the available programs. Given the fact of Father's incarceration, DCS's ability to provide services is limited. However, from the facts present here and Father's own testimony, it is obvious the Ms. Butler did everything she could do to assist Father in this case. Despite these efforts, it was Father who failed to take advantage of the opportunities. It was Father's failure to modify his behavior that resulted in him being expelled from the available programs. From the totality of the circumstances, we conclude that the trial court correctly found that DCS had exercised reasonable efforts in this case.

Having determined that the record supports the trial court's termination of Father's parental rights on two grounds, and that DCS exercised reasonable efforts to help Father, we next turn to address whether the record also supports, by clear and convincing evidence, the trial court's finding that termination of Father's parental rights was in the child's best interest.

## V. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App.

1994). When a parent has been found to be unfit upon establishment of a ground for termination of parental rights, then the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The focus shifts to the child's best interest. *Id.* at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id.* However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). "The child's best interest must be viewed from the child's, rather than the parent's, perspective." *Moody*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. *See* Tenn. Code Ann. § 36-1-113(i). This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877.

The trial court made specific findings concerning the child's best interest. From our review of the entire record, we conclude that clear and convincing evidence exists to support these findings. Specifically, Father has failed to change either his behavior or circumstance to make is possible for him to care for this child. The record clearly demonstrates that there is no relationship between Father and son. The Father has not seen the child since December 24, 2005 and has had minimal contact with him otherwise since that time. Rather, the child has bonded to his foster parents. We agree with the trial court that removing this child from the foster parents would cause the child harm. From the totality of the circumstances, we agree with the trial court that termination of Father's parental rights is in this child's best interest.

## VII. Conclusion

For the foregoing reasons, we affirm the order of the trial court terminating Father's parental rights. Costs of this appeal are assessed against the Appellant Father. Because Appellant is proceeding as a pauper in this appeal, execution may issue against Michael R. Q. for costs of the appeal if necessary. The case is remanded to the trial court for all further proceedings as may be necessary and consistent with this Opinion.

_____
J. STEVEN STAFFORD, JUDGE