IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 23, 2009 Session

**IN RE ADOPTION OF C.A.M. (d.o.b. 11/30/96)**

**JAMES KEITH JONES AND CARI LECKLITNER JONES**
**v.**
**MICHAEL DALE MOORE**

**An Appeal from the Chancery Court for Dyer County**
**No. 08A2    William Michael Maloan, Chancellor**

**No. W2008-02003-COA-R3-PT - Filed November 9, 2009**

This appeal involves the termination of parental rights. When the mother and father divorced, the mother was designated as the child's primary residential parent. In light of the mother's allegations that he had threatened her, the father was granted only supervised visitation. After the divorce, the father lived in Texas and visited the child in Tennessee. Several years later, the father remarried and was awarded unsupervised visitation with the child. Soon thereafter, the child went to Texas for a visit with the father and his new wife. During this visit, the father and his new wife had a domestic dispute in which the father locked her and the child out of their house. After this incident, the mother refused to allow the child to visit with the father. The father was then charged with assaulting his new wife and was given probation on this charge. Soon after that, the father violated the terms of his probation by testing positive for methamphetamine. He was sentenced to ten years in prison. At the time he was sentenced, the child was seven years old. Several years later, the mother remarried. The mother and her new husband then filed this petition to terminate the father's parental rights and to allow the mother's new husband to adopt the child. After a hearing, the trial court terminated the father's parental rights, finding grounds for termination and finding that termination was in the child's best interest. The father now appeals, challenging only the trial court's determination regarding the child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Ron Harvey, Germantown, Tennessee, for the appellant, Michael Dale Moore.

Jason R. Creasy, Dyersburg, Tennessee, for the appellees, James Keith Jones and Cari Lecklitner Jones.

**OPINION**

The minor child involved in this appeal, C.A.M., born on November 30, 1996, is the daughter of Petitioner/Appellee Cari Lecklitner Jones ("Mother") and Michael Dale Moore ("Father"). When C.A.M. was born, Mother and Father were married and lived in St. Louis, Missouri. When they separated, Mother and C.A.M. moved to Dyersburg, Tennessee to live with Mother's parents. Father moved to Tennessee for a short time, but soon moved to Denton, Texas. Mother filed for divorce in Tennessee, and the final decree of divorce was entered on June 2, 1998.

In the final decree, Mother was designated as C.A.M.'s primary residential parent, and Father was ordered to pay child support of approximately $400 per month. In the course of the divorce proceedings, Mother requested that Father's visitation with C.A.M. be supervised, alleging that Father had threatened her and her family with physical harm. The trial court granted Mother's request, and Father was granted supervised visitation in Tennessee every other weekend. Father came from Texas to Tennessee as often as practicable to exercise his visitation rights. During this time, Mother and C.A.M. were still living in Dyersburg with Mother's parents, and Father's supervised visitation took place in their home.

Following several post-divorce proceedings, in April 2002, Father was granted unsupervised visitation with C.A.M. By that time, Father had married Rhonda Moore ("Stepmother"). Father and Stepmother had a son, R.M. Between April 2002 and December 2002, C.A.M. traveled to Texas three times for extended visits with Father. Father also continued to travel to Tennessee periodically to visit C.A.M. During this time, Father made several child support payments, the last in October 2002.

During C.A.M.'s December 2002 visit with Father in Texas, Father and Stepmother became embroiled in a domestic dispute. The fracas culminated in Father locking Stepmother and the two children out of their home. After C.A.M. returned home to Mother, she blocked all communications between Father and C.A.M. and filed a motion to modify the current parenting arrangement and requested that the trial court enter a temporary restraining order prohibiting Father from visiting with C.A.M. pending a hearing on the motion. On June 19, 2003, the trial court issued the requested temporary restraining order prohibiting Father's visitation with C.A.M. A hearing on Mother's request to modify the parenting arrangement was held on July 28, 2003, but Father did not appear at the hearing. On August 15, 2003, the trial court entered an order continuing the injunction prohibiting Father's visitation with C.A.M. pending further orders of the court. The order indicated that, despite substantial efforts by Mother's counsel to ascertain Father's physical address, he could not be located. Oddly, the order nevertheless stated that, on July 25, 2003, Father had received actual notice of the hearing, but failed to appear. Father's last visit with C.A.M. prior to the hearing occurred during the December 2002 visit in Texas.

Perhaps not surprisingly, the dispute between Father and Stepmother resulted in heated divorce proceedings in Texas, during which Stepmother sought numerous orders of protection against Father. During 2003, Father was charged five times with violating protective orders entered by the Texas court, the most serious of which involved allegations that Father threatened Stepmother by putting a gun to her head. This resulted in Father being charged with aggravated assault with a

deadly weapon and retaliation. In March 2003, Father was incarcerated pending resolution of the charge,[1] and in early 2004, he entered into a plea bargain in which he agreed to an "Order of Community Supervision Without Adjudication of Guilt." At that point, Father was released from prison and placed on probation for ten years.

Shortly thereafter, on January 14, 2004, Father violated the terms of his probation by testing positive for methamphetamine. Consequently, his probation was revoked, and he was required to serve out the ten years in a Texas prison. At the time Father was incarcerated for the ten-year term, C.A.M. was seven (7) years old. While in prison, Father made attempts to call C.A.M., but Mother would not permit C.A.M. to speak to him.

Several years later, on November 3, 2007, Mother married Petitioner/Appellee James Keith Jones ("Stepfather"). On February 14, 2008, Mother and Stepfather filed the instant petition to terminate Father's parental rights in order to allow Stepfather to adopt C.A.M.[2]

On August 1, 2008, the trial was held on the termination petition. The trial court heard testimony from Mother, Father, Stepfather, C.A.M.'s maternal grandmother, and other witnesses as well.

Mother testified at the outset. She first described Father's violent tendencies. When she and Father were dating in the mid-1990s, Mother said, Father was verbally abusive to her and threatened her with physical harm. More recently, Mother asserted, Father threatened to kill her, and on at least two occasions he physically assaulted her. While Mother was pregnant with C.A.M., she said, Father hit her on the head above her ear. Mother claimed that domestic assault charges were filed against Father, but they were later dropped.

Mother acknowledged that Father had sent C.A.M. eight to twelve cards or letters while he was in prison. Mother explained that she did not show them all to C.A.M. because they promised that Father would "see her soon," which would have given C.A.M. false hope. Mother did show some of the pictures to C.A.M. and told her that Father was asking about her. Mother declined Father's requests for photographs of C.A.M., purportedly because she did not want the child's photograph in the prison out of concern that it might "easily get in the wrong hands." Mother said that she had maintained communication with Father's parents, C.A.M.'s paternal grandparents.

Mother testified that C.A.M. has a loving relationship with Stepfather, and that Stepfather "worships the ground she walks on." Mother asserted that it would be in C.A.M.'s best interest to be adopted by Stepfather to enable her to move forward with her life and avoid the potential for harm that could arise from continuing her relationship with Father.

---

[1]In 2003, Father was also convicted of driving while intoxicated.

[2]We note parenthetically that Mother does not have standing to file a petition to terminate Father's parental rights. *See Osborn v. Marr*, 127 S.W.3d 737, 740-41 (Tenn. 2004). This issue was apparently not raised in the trial court below and it does not affect our analysis because Stepfather, as a prospective adoptive parent, has standing. Tenn. Code Ann. § 36-1-113(b) (Supp. 2008).

Alice Ann Lecklitner, Mother's mother and C.A.M.'s maternal grandmother ("Grandmother"), testified at trial on behalf of Mother and Stepfather. Grandmother told the trial court that, while Mother and Father were in the midst of divorce proceedings, Father had made threats against her life and Mother's life, and he once threatened that he "might take [C.A.M.] and we might not see her again." Grandmother supervised Father's visitation with C.A.M. between 1998 and 2002. She said that Father's visits were irregular: "Sometimes he would come once a month. Maybe more often,. . . . Sometimes he might go several months without coming."

Grandmother indicated that she sees C.A.M. two or three times a day. She told the trial court that C.A.M. was doing well in school, was active in sports, and was a secure, loved child. She testified that Stepfather loves C.A.M. and would be an excellent father. Grandmother believed that future visitation with Father was not in C.A.M.'s best interest because Father's environment "is not what . . . environment I want her to grow up in."

Stepfather testified as well. He related that he has known C.A.M. since he began dating Mother in August 2002. Stepfather told the trial court that he loves C.A.M. and wishes to adopt her as his legal child. He said that he has had the same job as a car salesman for twenty years, and that he makes a substantial annual salary.

Father's longtime friend Bonnie Kidd ("Kidd") testified on his behalf. Kidd said that Father lived with her and her husband when Father was seventeen years old, and she considers Father to be a part of her family. She described Father as being very close to C.A.M., and said that his relationship with his child was very important to him. After the divorce from Mother, Kidd said, Father expended great effort and great expense to visit with C.A.M., and he saw her as often as he could. Kidd had remained in contact with Father in prison by exchanging letters with him. She said that Father had written her hundreds of letters inquiring about C.A.M. and also about R.M., his son with Stepmother. On behalf of Father, Kidd wrote Mother a letter asking her to send Father pictures of C.A.M. She enclosed $20 with the letter to Mother to cover the cost of the pictures. Mother refused to send photos for Father, and did not return to Kidd the money she had sent.

Father testified on his own behalf. After his divorce from Mother, he said, he visited C.A.M. at every opportunity, frequently traveling to Tennessee for supervised visitation with her. After he was granted the right to unsupervised visitation in April 2002, C.A.M. came to Texas for three extended visits with him. Father testified that, despite the incident in December 2002 in which Father locked Stepmother and the two children out of the house, C.A.M. cried when she had to leave him at the end of the visit, and she told Father that she wanted to live with him. After the December 2002 incident, Father stated, Mother would not let him see C.A.M or talk to her on the telephone, despite his constant requests. After he was incarcerated, Father tried to call C.A.M., but Mother would either not answer or would refuse to let him speak to her. Father sent letters to C.A.M. from prison, but all of them went unanswered. Father wrote letters to other people, asking for news about his children. Some of the letters he wrote while he was in prison were made exhibits at trial.

Father testified about the proceedings in his divorce from Stepmother in January 2003. After that hearing, Father claimed, "[e]very time I turned around she was filing something," adding "[a]fter that point, I was getting arrested on a weekly basis for violation of a protective order." He denied

the allegation that he put a gun to Stepmother's head, calling the charge "ridiculous," and he denied harming Stepmother in any way. He also denied hitting Mother in the head. Father claimed that he was never told that violating his probation might result in his incarceration. He denied using methamphetamine and explained that his positive drug test probably resulted from an injection two days earlier for a bee sting. "So basically it was on a technical violation is what I was violated on."

Father admitted that he was delinquent on his child support payments. He claimed that his delinquency was not willful, but that it occurred because he worked on commission selling signs to hotels and, thus, his pay was irregular. When he received a commission check, he said, he paid several child support payments at a time. Father claimed he helped Mother and C.A.M. financially as much as he could, for example, by purchasing a $1,500 swingset for C.A.M. and by paying for her birthday parties. Father acknowledged that, in 2000, he bought a Volvo automobile for himself with cash, and that he paid a $30,000 down payment on the purchase of a house. He explained that his sign business declined greatly after the national events of September 11, 2001. Nevertheless, the subsequent bonds to get Father out of jail cost some $50,000 to $60,000; Father said that friends helped him pay much of that total. Father admitted that his last child support payment was made in October 2002.

Father testified that he loves his daughter and continues to have a bond with her despite the obstacles. Father asserted his belief that it is in C.A.M.'s best interest to continue having a parent/child relationship with him.

At the conclusion of the hearing, the trial court issued an oral ruling that the petitioners had proven grounds for the termination of Father's parental rights, and that termination was in C.A.M.'s best interest. On August 21, 2008, the trial court entered a written order, finding that grounds for terminating Father's parental rights, namely Father's incarceration for a period of at least ten years at a time when C.A.M. was under eight years old, pursuant to Tennessee Code Annotated § 36-1-113(g)(6),[3] and also abandonment for willful failure to pay child support since October 2002,

---

[3]Termination of Parental Rights.

...
      (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds . . .:

      (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
...
      (6) The parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court.

Tenn. Code Ann. § 36-1-113(g)(1), (6) (Supp. 2008). As relevant to this case, "abandonment" is defined as:

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make

(continued...)

-5-

pursuant to Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A). The order stated further that "[e]ach and every one of the nine (9) factors set forth in T.C.A. § 36-1-113(i) support the finding that termination of [Father's] parental rights is in the best interests of [C.A.M.]." From this order, Father now appeals.

## ISSUES ON APPEAL

On appeal, Father concedes that grounds for termination exist based on his period of incarceration. He argues in this appeal that the petitioners failed to establish by clear and convincing evidence that terminating his parental rights was in C.A.M.'s best interest. Father also argues that the decision below must be reversed because the trial court did not make specific findings of fact as is required under Section 36-1-113(k) of the Tennessee Code Annotated. *See* Tenn. Code Ann. § 36-1-113(k) (Supp. 2008); *see In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

## ANALYSIS

Although "parents have a fundamental right to the care, custody, and control of their children," this right is not absolute, and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute. *Kilpatrick v. Drinnon (In re Drinnon)*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). In Tennessee, parental rights may be terminated by the court if (1) the existence of at least one statutory ground is proven by clear and convincing evidence and (2) it is clearly and convincingly established that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re R.L.F.*, 278 S.W.3d 305, 311 (Tenn. Ct. App. 2008). Our standard of review for cases involving termination of parental rights was stated in *In re F.R.R., III*, 193 S.W.3d 528 (Tenn. 2006):

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination

---

[3](...continued)
reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2005).

of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*Id.* at 530. In this appeal, Father does not challenge the trial court's finding of grounds for terminating his parental rights. Our review focuses on the best interest of the child, namely whether the trial court made the required specific findings of fact and whether the evidence clearly and convincingly established that terminating Father's parental rights is in the best interest of C.A.M.

Tennessee statutes governing termination proceedings provide expressly that, in determining whether the termination of parental rights is in the best interest of a child, the court shall consider the following factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent and guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2008). The factors enumerated above are not exhaustive, and "[t]he statute does not require every factor to appear before a court can find that termination is in a child's best interest." *Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-PT, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002).

In its written order, the trial court set out the facts supporting its conclusion that grounds for termination of Father's parental rights existed by clear and convincing evidence. The trial court found specifically that, in Texas in 2004, Father was convicted of the felony crimes of aggravated assault with a deadly weapon and retaliation, for which he received a ten (10) year sentence; that Father is currently incarcerated and was incarcerated on the date of the filing of the termination petition; that prior to his incarceration, Father had the means and ability to pay child support for C.A.M. but has failed to pay any child support for her since October 14, 2002; that Stepfather is a fit person to have care and custody of C.A.M.; and that Stepfather is financially able to care for C.A.M. These findings are based at least in part on the trial court's implicit credibility determination in favor of Mother and Stepfather. Factual findings by a trial court based on the credibility of the witnesses will not be reversed absent clear and convincing evidence to the contrary. *See In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007).

In the section of the order discussing the child's best interest, the trial court simply stated that "[e]ach and every one of the nine (9) factors set forth in T.C.A. § 36-1-113(i) support the finding that termination of [Father's] rights is in the best interest of [C.A.M.]." The question becomes whether the trial court made sufficient findings of fact and conclusions of law to satisfy Section 36-1-113(k).[4] If so, we must then determine whether those facts, as supported by a preponderance of the evidence and our review of the record as a whole, show clearly and convincingly that termination of Father's parental rights is in C.A.M.'s best interest.

The specific findings of fact are set out in the portion of the trial court's order relating to the grounds for termination, and they are not repeated in the section on C.A.M.'s best interest. While the termination statutes require that the trial court make specific findings of fact, there is no authority indicating that the findings must be in a particular section of the trial court's order. *See In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *7 n.6 (Tenn. Ct. App. May 15, 2009). Often the findings of fact supporting the grounds for termination are also relevant to the issue of whether termination is in the child's best interest. So long as the trial court's written order contains findings of requisite specificity that show that termination is in the child's best interest, the fact that the findings are not set out in the "best interest" section of the order does not render the order insufficient. In this case, the trial court found that Father was convicted of a violent felony, was incarcerated for a period of ten years, and willfully failed to support C.A.M. The trial court also found that Stepfather is a fit person to care for C.A.M. and is able to financially support her. These factual findings relate to C.A.M.'s best interest as well as grounds, and the trial court was not required to repeat them in the best interest section of the order.

We consider, then, Father's assertion that the evidence in the record does not clearly and convincingly establish that terminating Father's parental rights is in C.A.M.'s best interest. Father claims that many of the statutory best interest factors weigh in his favor. For example, he claims that the evidence shows that, until his incarceration, he maintained visitation with C.A.M. after the divorce and established a meaningful relationship with C.A.M., despite Mother's efforts to hamper

---

[4]The statute provides that "[t]he court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." Tenn. Code Ann. § 36-1-113(k) (Supp. 2008).

their relationship. Father also notes that there is "not a shred of evidence" that he has shown brutality toward C.A.M., and he claims that the evidence of violence toward Mother was weak. Father argues that there was no evidence that he abused drugs or alcohol, except the positive methamphetamine screen that Father claimed was caused by other medications. Father admits that he failed to pay child support as ordered, but claims that the evidence shows that his failure to support C.A.M. was not willful. Father also points to other payments he made for the benefit of C.A.M.

We are mindful that the record contains undisputed evidence that Father loves C.A.M., that he made substantial efforts to visit with her despite his distance from her, and that he attempted to maintain his relationship with her during his subsequent imprisonment. However, at this point, our focus is not on Father's best interest; it must be on the best interest of C.A.M. in light of the circumstances as they presently exist. It is undisputed that Father has not visited with C.A.M. since January 1, 2003, when C.A.M. was six years old. This is a direct result of Father's choices -- first because his behavior caused the Tennessee trial court to prevent contact with C.A.M., and subsequently because his positive drug test caused the revocation of his probation and his resulting incarceration. It is further undisputed that Father made no child support payments after October 2002, and the evidence supports the trial court's finding that he had the ability to pay support and willfully failed to do so. Contrary to Father's denial, substantial evidence at trial showed that Father threatened both Mother and Grandmother, and that he physically struck Mother when she was pregnant with C.A.M. Furthermore, the undisputed evidence at trial supports the trial court's finding that Stepfather is a fit and proper person to fulfill the responsibilities for parenting C.A.M., and it shows further that Stepfather and C.A.M. have a loving relationship. From our review of the record, giving due deference to the trial court's credibility determinations, we find that the record fully supports the trial court's determination that the evidence establishes clearly and convincingly that terminating Father's parental rights is in the best interest of C.A.M. Therefore, we find that the trial court did not err in terminating Father's parental rights.

The decision of the trial court is affirmed.  Costs on appeal are to be taxed to Appellant Michael Dale Moore and his surety, for which execution may issue, if necessary.

 

_____

HOLLY M. KIRBY, JUDGE