IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned On Briefs October 4, 2010 Session

# IN THE MATTER OF: APRIL F. (d.o.b. 11/20/98), DYLAN F. (d.o.b. 3/30/00), and DEVIN F. (d.o.b. 7/24/06) ET AL.

**Direct Appeal from the Juvenile Court for Decatur County**
**No. J06-120, 235      Ricky L. Wood, Judge**

**No. W2010-00803-COA-R3-PT - Filed November 22, 2010**

This is a termination of parental rights case. The juvenile court terminated the parental rights of the father on the grounds of persistence of conditions, substantial noncompliance with the terms of the permanency plans, and abandonment by willful failure to support. The father appeals, arguing that the Department of Children's Services did not clearly and convincingly show that it made reasonable efforts to help him address his addiction to methamphetamine, clearly and convincingly prove grounds for termination, or clearly and convincingly demonstrate that termination of his parental rights was in the best interests of the children. Because DCS did not clearly and convincingly demonstrate that it made reasonable efforts to reunite the father with his children, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J. and J. STEVEN STAFFORD, J., joined.

Kimberly M. Hinson, Linden, Tennessee, for the appellant, Timothy F.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, Ryan L. McGehee, Assistant Attorney General and Mary L. White, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

**OPINION**

**I. Background and Procedural History**

This appeal concerns the parental rights of the respondent/appellant, Timothy F. ("Father"), an admitted methamphetamine addict who is currently serving the remainder of an eight-year prison sentence due to a probation violation.[1] The Department of Children's Services ("DCS") initially obtained custody of two of Father's children, April F. (d.o.b. 11/20/98) and Dylan F. (d.o.b. 3/30/00), after local authorities arrested Father and Wendy F. ("Mother") for possession of methamphetamine with intent to sell in May 2006.[2] Father's third child, Devin F., was born in July 2006 shortly after Mother was released from jail on bond. Because Mother and Devin tested negative for all illegal substances at the time of his birth, DCS did not initially remove the child from his parents' care. Additionally, the juvenile court briefly permitted April and Dylan to return to their Mother's care for a ninety-day trial home visit subject to the requirement that Father leave the home and have no contact with the children, but this arrangement was short-lived.[3] The court terminated the trial home visit after approximately one month because authorities found Father hiding out at the marital residence. DCS consequently filed a petition alleging that all three children were dependent and neglected due to continued exposure to Father, who had acknowledged an addiction to methamphetamine and a need for inpatient treatment. As a result of this petition, the juvenile court placed all three children in the temporary care, custody, and control of David and Gayle M., who had previously served as foster parents to April and Dylan. The children continued in the custody of the foster parents throughout the remainder of the proceedings.

DCS developed three permanency plans intended to address the parental issues—primarily Father's drug addiction and the parents' criminal behavior—that led to the children's removal. The first permanency plan, which pertained only to April and Dylan, included dual goals of reunification with parents and/or exit custody to live with relatives. The first plan sought to provide the parents with sufficient visitation, including therapeutic visitation, to maintain a bond with the children; to provide a drug free and safe environment for the children; and to ensure that the parents were emotionally and mentally stable. The plan required the parents to (1) resolve their outstanding legal issues, (2) secure adequate

---

[1]The mother voluntarily relinquished her parental rights prior to the conclusion of the termination hearing in this case and is not a party to this appeal.

[2]The record shows that Father previously pled guilty to possession of methamphetamine with intent to sell in 2003.

[3]Legal custody remained with DCS under the terms of the court's order and would not revert to Mother unless the Court so ordered at a subsequent hearing.

housing and financial support, (3) demonstrate a drug free environment, (4) submit to random drug screening, (5) receive an alcohol and drug assessment, and (6) follow all recommendations of the alcohol and drug assessment. Father and Mother signed the initial plan on June 16, 2006. The juvenile court ratified the plan on July 17, 2006, and entered an order to this effect on July 31, 2006.[4]

The second plan, which pertained only to Devin, contained goals and requirements nearly identical to the first plan. The main difference is that the second plan specifically required Father to complete rehabilitation as recommended under the terms of an alcohol and drug assessment that Cumberland Heights, an alcohol and drug treatment center in Jackson, Tennessee, had previously administered. Father and Mother signed the second plan on October 26, 2006. The juvenile court ratified the plan on November 6, 2006.

DCS created a third permanency plan, which pertained to all three children, in September 2007. The third plan retained the goals of reunification with parents and/or exit custody to live with relatives pursuant to the court's order but changed Father's responsibilities. The third plan required Father to resolve all outstanding legal issues, including a no-contact order limiting his visitation with the children, and to demonstrate compliance with all probation requirements. Although the terms of Father's probation prohibited the use of drugs, it is unclear whether they also required Father to complete treatment for his methamphetamine addiction. Thus, while the third plan specifically noted Father's addiction to methamphetamine, it curiously did not require compliance with the recommendations of his previous alcohol and drug assessment.

DCS provided the parents various services, which are detailed herein, following the creation of the initial permanency plan. The parents' ongoing legal issues, however, hindered DCS's provision of services. In January 2007, Father pled guilty to possession of methamphetamine with intent to sell arising out of his 2006 arrest and received an eight-year sentence. The court ordered Father to serve the first year of his sentence in prison beginning March 5, 2007, and to serve the remaining seven years under community corrections probation. Father served his time and was released in January 2008. The conditions of Father's probation agreement required that he remain drug free and obey the laws of Tennessee. Despite facing a lengthy sentence in the event of a relapse, Father did not contact DCS upon his release from prison or seek treatment for his methamphetamine addiction. Father consequently failed to comply with his probation requirements and tested positive for

_____

[4]The court's order on ratification acknowledged that the principal concern with the parents, and not coincidentally the focus of the initial permanency plan, was their ability to provide April and Dylan a drug free household. The court explained that no barriers to reunification would exist if the parents could "get their drug issues under control."

methamphetamine on March 5, 2008. Father's positive drug screen led to a revocation hearing at which the court found him guilty of violating the terms of his probation. As a result, the court ordered Father to return to prison to serve the remainder of his eight-year sentence. Although Father had secured admission to the Buffalo Valley Treatment Center following his March 5 drug screen, he was unable to attend due to his incarceration. According to the record, Father will remain incarcerated until 2015.

DCS filed the termination petition at issue in November 2007 while Father was serving the first year of his sentence. The petition alleged persistent conditions based in part on Father's drug-related criminal history and his alleged inability to stay out of jail and off of drugs.[5] The petition further alleged that removal of the children was in their best interests because the parents had not made an adjustment of circumstances, conduct, or conditions that would make it safe for the children to return home; the parents had not effected a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment did not appear reasonably possible; Father's use of alcohol and drugs rendered him unable to care for the children in a safe and stable manner; the children were residing with foster parents who wished to adopt them; and the children had established a strong bond with the foster parents.

The juvenile court conducted a hearing on DCS's petition over several days beginning April 28, 2008, and concluding March 6, 2009.[6] The parties presented substantial proof, including the testimony of several witnesses, to address the reasonableness of DCS's efforts, Father's continuing addiction to drugs, Father's continuing legal troubles, and the appropriateness of the foster parents as a long-term placement for the children. The court heard from Linda Baker ("Ms. Baker"), one of Father's family services workers; April Inman, a DCS investigator; Holly Zelno, an employee of the Quinco Mental Health Center ("Quinco"); Tracy Maness, Father's probation officer; Brian White, the children's counselor at Quinco; Gina Aldridge, an employee of Health Connect America; and Sylvia M., the foster mother. The court also heard the testimony of Father and Mother.[7] At the conclusion of the hearing, the juvenile court took the matter under advisement.

---

[5]DCS later filed a motion to amend its petition to include an allegation of substantial noncompliance with the terms of the permanency plans, which it argued the parties tried by consent during the initial phase of the termination hearing. The juvenile court granted the motion to amend and later relied upon substantial noncompliance as a ground for termination.

[6]It became necessary to continue the termination hearing for various reasons throughout the course of these proceedings.

[7]Mother testified at the initial proceedings which transpired prior to the voluntary relinquishment of her parental rights.

On December 21, 2009, the juvenile court entered a lengthy and detailed order terminating the parental rights of Father. The court found the following witnesses credible: Linda Baker, Sylvia M., Brian White, Holly Zelno, Tracy Maness, April Inman, and Gina Aldridge. Its factual findings relied heavily on the testimony of these witnesses, at times impliedly rejecting Father's version of events. The court found, *inter alia*, that Father had neglected his responsibility to comply with the recommendations of his alcohol and drug assessment, Father had not remained drug free, Father had not made a change of circumstances that would permit reunification with his children, and Father had not created a safe and drug free environment in which to raise the children. The foster parents, however, had provided the children with a safe and loving home; opportunities for emotional, physical, and spiritual development; and a chance for stability in their lives. In light of these and other findings, the court concluded as a matter of law that DCS clearly and convincingly proved that it made reasonable efforts to reunite Father with his children, Father was in substantial noncompliance with the terms of the permanency plans, the conditions leading to the children's removal persisted, Father willfully failed to support the children, and termination of Father's parental rights was in the best interests of the children. This appeal ensued.

## II. Issue Presented

The dispositive issue before this Court, as we perceive it, is whether DCS clearly and convincingly proved that it expended reasonable efforts to reunite Father with his children in light of his addiction to methamphetamine.[8]

## III. Standard of Review

This Court reviews a trial court's findings of fact *de novo* upon the record, according a presumption of correctness to the findings unless a preponderance of the evidence is to the contrary. Tenn. R. App. P. 13(d)*; In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citation omitted). This Court will not reevaluate the determinations of a trial court based on an assessment of credibility unless clear and convincing evidence is to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005) (citation omitted). This Court reviews the record *de novo* where the trial court has not made a specific finding of fact. *In re*

[8]We note that DCS did not seek termination on the basis of abandonment for willful failure to support in its petition as amended and has not briefed this issue on appeal. This issue is therefore waived. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. App. R. 6(a), (b); *Bean v. Bean*, 40 S.W.3d 52, 55-56 (Tenn. Ct. App. 2000) (citations omitted). Further, DCS does not argue that the prior order of a court of competent jurisdiction finding aggravated circumstances relieved DCS of its duty to expend reasonable efforts pursuant to Tennessee Code Annotated section 37-1-166(g)(4). *See In re A.R.*, No. M2007-00618-COA-R3-PT, 2007 WL 4357837, at *11-12 (Tenn. Ct. App. Dec. 13, 2007) (addressing the circumstances under which a finding of abandonment relieves DCS of its duty to expend reasonable efforts).

*Valentine*, 79 S.W.3d at 546 (citation omitted). No presumption of correctness attaches to a trial court's conclusions of law. Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citation omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights. The Code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c)(1), (2) (2010). This two-step analysis requires appellate courts to consider "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Although the 'clear and convincing evidence' standard is more exacting than the 'preponderance of the evidence' standard, it does not require the certainty demanded by the 'beyond a reasonable doubt' standard." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007) (citation omitted). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *Id.* (citation omitted).

The clear and convincing standard is necessary because parents have a fundamental right to the care and custody of their children. *Santosky v. Kramer*, 455 U.S. 745, 768-69 (1982); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citation omitted). "No civil action carries with it graver consequences than a petition to sever family ties indelibly and forever." *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *4 (Tenn. Ct. App. Mar. 9, 2004) (citations omitted). The termination of parental rights eliminates "all of the rights, responsibilities, and obligations of the parent[]," Tenn. Code Ann. § 36-1-113(d)(3)(C)(i), and removes a parent's "right to object to the child's adoption or thereafter, at any time, to have any relationship, legal or otherwise, with the child," Tenn. Code Ann. § 36-1-113(d)(3)(C)(iii). The heightened burden of proof in parental termination cases guards against unwarranted severance of the constitutionally protected parent-child relationship. *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Additionally, "[t]he heightened burden of proof in parental termination cases requires us to distinguish between the trial court's findings with respect to specific facts and the

'combined weight of these facts.'" *In re T.L.N.*, No. M2008-01151-COA-R3-PT, 2009 WL 152544, at *3 (Tenn. Ct. App. Jan. 21, 2009) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 n.35 (Tenn. Ct. App. 2004)). "Although we presume the trial court's specific findings of fact to be correct if they are supported by a preponderance of the evidence, 'we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion.'" *Id.* (quoting *In re M.J.B.*, 140 S.W.3d at 654 n.35).

## IV. Analysis

### *A. Reasonable Efforts*

Father's principal argument in this appeal is that DCS failed to make reasonable efforts to help him remedy the conditions that led to the children's removal, namely, his drug addiction and related legal issues. The decision to pursue a termination of parental rights on the grounds of persistence of conditions and substantial noncompliance invokes DCS's statutory duty to make reasonable efforts to facilitate the safe return of a child to the child's home. *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008) (citing Tenn. Code Ann. § 37-1-166(b), -166(a)(2), -166(g)(2)); *see also In re Tiffany B.*, 228 S.W.3d 148, 151, 160 (Tenn. Ct. App. 2007) (vacating a finding of abandonment, substantial noncompliance, and persistence of conditions for failure to make reasonable efforts). This statutory duty includes an obligation to exercise "'reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family.'" *In re R.L.F.*, 278 S.W.3d at 316 (emphasis omitted) (citing Tenn. Code Ann. § 37-1-166(g)(1)). Courts evaluate the reasonableness of DCS's efforts in consideration of the following factors:

> (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B.*, 228 S.W.3d at 158-59 (footnote omitted) (citing *In re Giorgianna H.*, 205 S.W.3d. 508, 519 (Tenn. Ct. App. 2006)). The burden is on DCS to prove clearly and convincingly the reasonableness of its efforts. *In re R.L.F.*, 278 S.W.3d at 316 (citing *In re B.B.*, No. M2003-01234-COA-R3-PT, 2004 WL 1283983, at *9 (Tenn. Ct. App. June 9, 2004)).

The exercise of reasonable efforts is essential because "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H.*, 205 S.W.3d at 518. DCS employees must therefore affirmatively and reasonably utilize their education and training to help parents eliminate the conditions that led to the removal of their child and to meet the responsibilities of their permanency plans before courts will terminate the parent-child relationship. *In re R.L.F.*, 278 S.W.3d at 316 (citations omitted). DCS's duty to affirmatively assist parents exists even if the parents do not seek assistance. *Id.* (citing *In re C.M.M.*, 2004 WL 438326, at *7). This is especially true where a parent suffers from a debilitating addiction to methamphetamine.[9] *See In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *10 (Tenn. Ct. App. Apr. 14, 2005) (footnotes omitted). "The Department and its professional staff must know and understand that persons with addictions to substances as powerful as methamphetamine have false starts and set backs, as well as successes and, regrettably, backsliding." *Id.* at 11. "While the Department's reunification efforts need not be 'herculean,' the Department must do more than simply provide the parents with a list of services and send them on their way." *In re Giorgianna H.*, 205 S.W.3d at 519 (citation omitted). The existence of budgetary limitations does not excuse DCS from its duty to expend reasonable efforts. *In re Tiffany B.*, 228 S.W.3d at 158 (citation omitted).

The General Assembly, however, did not place the burden to reunify parent and child on DCS's shoulders alone. *See State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008) (citation omitted). Reunification "is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents." *In re Tiffany B.*, 228 S.W.3d at 159 (citations omitted). "Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody." *Id.* "They must also make reasonable efforts to rehabilitate themselves once services have been made available to them." *Id.* (citations omitted).

---

[9]This Court has stated:

> Methamphetamine is powerfully addictive. It has one of the highest recidivism rates of all abused substances. Research demonstrates that a severe methamphetamine abuser's brain functioning does not return to normal for up to one year after the abuse ends. According to Dr. John Averitt, a psychologist and drug treatment counselor in Cookeville, Tennessee, "[a] chronic meth user's brain is never the same again. Normal pleasures, like a trip to the beach or a pleasant meal, no longer feel good. You've got to keep using the drug to feel that pleasure, or take the drug to stop the terrible feelings that result." For these reasons, the Tennessee Governor's Task Force recommends treatment programs with durations of at least twelve months to help recovering methamphetamine addicts.

*In re M.J.M., Jr.*, 2005 WL 873302, at *10.

The juvenile court sided with DCS on the question of reasonable efforts, placing emphasis on Father's failure to address affirmatively his methamphetamine addiction and failure to take advantage of available services. In its order, the court entered the following factual findings on this issue:

18.    DCS provided the . . . family with targeted case management, counseling, parenting classes, random drug screens, hair follicle tests, placed the children on a trial home visit, performed background checks and home studies on several suggested placements (including relative placements), prior to the children entering foster care and in attempt to avoid the same. DCS also provided therapeutic visitation with the children, including transporting the children to the visits, even when [Father] was incarcerated, (DCS made reasonable efforts for the father to visit with his children, up and until the time the Court suspended the visits by order of the Court on December 7, 2007). DCS provided medical and dental examinations for the children and any recommended follow-up treatment, immunizations, and the recommendation of an alcohol and drug assessment (A& D) for the father. The father did subsequently obtain and [sic] A& D assessment.

19.    DCS recommended the A&D assessment for [Father]. [Father] testified in open court that he attended the A& D assessment at Cumberland Heights that had been set up by DCS. Per the June, 2006 Permanency Plan, [Father] was to receive an A & D assessment and follow all of the recommendations of the assessment.

20.    [Father] also testified in open court that he completed an A & D assessment at Cumberland Heights but did not follow-up on the recommendations. The record reflects that at the April 28, 2008 hearing, [Father] testified that the A &D assessment recommendations included: intensive outpatient A & D counseling, weekly meetings and inpatient treatment. However, [Father] did not comply with the recommendations.

21.    [Father] did not inform any DCS representative that he had any transportation concerns and/or problems that would have prohibited him from attending the weekly A& D meetings or complying with the intensive outpatient services as are outlined in his assessment, the same of which he testified to in open court. Further, there are no findings in the record where [Father] ever requested outpatient A&D rehabilitation

services from another provider other [than] Cumberland Heights, with the exception of [Father's] desire/decision to attend inpatient drug treatment at Buffalo Valley and this desire/decision was never opposed by DCS.

22.     In addition, per the permanency plan, [Father] was required to complete inpatient rehabilitation and this was something he chose to pursue but failed to do . . . . DCS' efforts to provide drug counseling and/or rehabilitation to address [Father's] drug addiction were hindered by his persistent and lengthy incarcerations and his refusal to comply with the A&D assessment recommendations (specifically as stated earlier, at no time did [Father] inform DCS that he had transportation concerns or was somehow unable to follow the assessment recommendations and as such his failure to comply with the recommendations of which he was aware and of which he testified to at court, was tantamount to a refusal to comply with the assessment recommendations).

23.     The record reveals that [Father] admitted in open court (April 28, 2008 hearing) that he had planned to attend inpatient drug rehabilitation at Buffalo Valley Drug Rehabilitation Center for at least six (6) months or maybe up to one (1) year. Despite having been assigned a bed at Buffalo Valley for inpatient drug treatment in March, 2008, he did not successfully complete the program due to becoming incarcerated again for drug usage and drug related issues.

. . . .

37.     When [Father] was released from jail in January 28, 2008, he did not make contact with DCS to let them know that he was out of jail (i.e., see Exhibit 28, dated April 3, 2007, which [Father] signed stating he would make immediate contact with DCS upon his release from jail). The contact was necessary in order for . . . DCS to work with [Father] in an effort to provide services to him.

38.     [Father] has not been diligent in seeking help for his addiction. [Father] testified that despite having probation officer(s) who could have assisted him in obtaining treatment, he failed to address the issue with them. In addition, prior to his present incarceration, [Father] acknowledged that during the numerous times that he was in Circuit Court for drug offenses, he failed to ask the court system for help in

-10-

getting into a long-term rehabilitation program. In fact, he testified that he did not inquire about making long-term rehabilitation a part of his sentence.

. . . .

49.    That [Father's] failure to comply with the A & D assessment and the permanency plans in general, was due to decisions of his own making and/or choices. That even when [Father] had a placement opportunity (such as securing a bed) in an inpatient treatment facility, that he was unable to take advantage of the inpatient treatment opportunities because he was arrested for violation [of] probation due to drug use. Again, his arrest was as a result of his own doing.

50.    That as stated earlier, DCS could not force [Father] to comply with the A& D assessment recommendations. Further, DCS' efforts in providing services to [Father] were hindered by his persistent incarceration and the failure to contact DCS when he was released from jail in January, 2008. However, the record is abundantly clear that DCS' efforts were more than reasonable in its dealings with and in its providing of services to [Father], his wife and their children.

Having reviewed the record, we conclude that the evidence does not preponderate against the majority of the juvenile court's factual findings or, where applicable, clearly and convincingly rebut the findings based on witness credibility.

The evidence does, however, preponderate against the court's finding that DCS provided Father with drug counseling. The only evidence supporting this factual finding is an affidavit of reasonable efforts and a corresponding court order entered only two months after April and Dylan came into DCS's custody. This Court in *In re Giorgianna H.*, 205 S.W.3d 508 (Tenn. Ct. App. 2006), cautioned in a footnote:

As a general rule, a properly prepared and appropriately detailed affidavit meeting the requirements of Tenn. Code Ann. § 37-1-166(c) (2005) is sufficient to establish the extent and reasonableness of the Department's reunification efforts. Thus, unless a parent takes issue with the adequacy of the Department's efforts, the Department need not present additional evidence regarding its efforts to reunify the family. However, if a parent takes issue with the adequacy of the Department's reunification efforts, the Department may be required to present additional evidence regarding its efforts and to

-11-

make its employees and contractors involved with these efforts available for discovery or cross-examination at trial. *In re C.M.M.*, 2004 WL 438326, at *8.

*In re Giorgianna H.*, 205 S.W.3d at 518 n.22. Here, Father has not only taken issue with the reasonableness of DCS's efforts, but he has also provided unrefuted testimony to show that DCS did not provide him counseling of any sort. Having reviewed the record in its entirety, we conclude that the evidence preponderates against the court's finding that DCS provided Father with drug counseling. Thus, the dispositive question in this appeal is whether the factual findings supported by a preponderance of the evidence, when considered in light of the additional, undisputed testimony in the record, clearly and convincingly establish that DCS made reasonable efforts to reunite Father with his children.

Father argues that DCS failed to exercise reasonable efforts to help him address his drug addiction, which was the primary impediment to reunification with his children. He principally points to the testimony of Ms. Baker regarding DCS's efforts. Importantly, Ms. Baker testified that DCS did not offer Father outpatient treatment because it was available to him through other resources, DCS did not provide him a list of those resources, and DCS did not meet with him to discuss those resources. Ms. Baker's testimony suggests that she did not view it as DCS's duty to sit drug-addicted parents down and put that information in front them or, in her words, to "spoon feed them and force them into a program that may not be successful for them[.]" Additionally, Ms. Baker testified that DCS could have provided Father with a bed at a drug rehabilitation facility, but he did not ask for it. Father argues that, although Ms. Baker testified that Father chose to complete his jail sentence before going to treatment, she also testified that he needed to complete his criminal sentence prior to addressing his drug addiction, describing the resolution of his legal issues as "the first step" he needed to take under the parenting plans. Father further contends that DCS did not provide any additional services despite learning that Father no longer had TennCare or other insurance by October 2006. To the extent DCS places the blame for Father's failure on his inaction, he submits that "'the Department apparently expected the parents to initiate the remedial efforts on their own and to ask their case manager for help. This expectation was unreasonable.'" (Quoting *In re Tiffany B.*, 228 S.W.3d at 160).

Father also disagrees with the contention that he failed to make reasonable efforts. Although Ms. Baker was not sure when Father obtained an alcohol and drug assessment or what the exact recommendations of that assessment were, she acknowledged that Father underwent the assessment of his own volition. She further acknowledged that Father reported working toward rehabilitation after receiving his assessment. Father suggests that his subsequent inability to obtain and successfully complete the necessary treatment stemmed from his limited financial resources, transportation issues, and incarceration. Father submits that the proof showed he worked long hours as a roofer and was the sole provider for his

family, which limited the financial resources and time available to address his addiction. Father also points to testimony stating that he did not attend an intensive outpatient program in Jackson due to transportation problems. These issues were exacerbated in Father's view because DCS did not apprise him or his attorney of other available resources or make any additional referrals so that Father could take advantage of viable alternatives. Father adds that Ms. Baker admitted that DCS did not offer Father any services from December 2007 to March 2008 because he was waiting for a residential bed at Cumberland Heights.[10] And the record shows that Ms. Baker never called Cumberland Heights to inquire about the hold up with Father's placement.[11] It is Father's position that he expended reasonable efforts to address his drug addiction without significant aid from DCS, even though he was ultimately unsuccessful.

DCS disagrees with the suggestion that it failed to exercise reasonable efforts, placing the responsibility for Father's failure to become drug free squarely on his shoulders. DCS points out that Father did not affirmatively act to address his addiction: "Father did not enter a drug rehabilitation program, request any assistance entering drug rehabilitation from DCS, or report any obstacles in seeking treatment to the Department." DCS adds that, although Father informed DCS he would seek drug treatment after his release from prison in 2008, he did not contact DCS following his release or ultimately seek treatment. Further, Father did not seek assistance from his parole officer or inquire about whether he could enter drug rehabilitation as a part of his criminal sentence.[12] DCS rejects Father's contention that a lack of transportation or financial resources hindered his ability to obtain treatment, stating that "at no time did Father inform DCS that a lack of transportation or financial means were obstacles to drug rehabilitation treatment." In DCS's view, Father "demonstrated a pattern of not requesting assistance with drug rehabilitation efforts." According to DCS, the suggestion that Father failed to undergo treatment due to his incarceration ignores that fact that Father obtained his assessment between June and October of 2006 but did not seek treatment prior to his incarceration in March 2007.[13] Further, Father did not enroll in the inpatient drug treatment program at Buffalo Valley until after he failed a drug screen in

---

[10]The record is silent about who initiated this attempt to place Father at Cumberland Heights. Ms. Baker testified that it was Father's choice to seek residential treatment at this facility.

[11]Ms. Baker had no personal knowledge about whether anyone else at DCS had called to check on Father's status.

[12]Father testified that his criminal attorney advised him against making long-term rehabilitation part of his sentence.

[13]Father testified that he did not initially seek treatment because he believed he had to finish his sentence before going to rehabilitation.

March 2008 that violated his probation. DCS submits that Father's late efforts to obtain treatment only after two years of separation from his children and only after he committed a probation violation that would send him back to prison were unreasonable.

The problem with DCS's position is that it places the entire responsibility for Father's recovery on him. We find it troubling that DCS could not provide a copy of Father's alcohol and drug assessment or testimony on its recommendations beyond information gleaned from Father. Ms. Baker testified that she did not request a copy of the assessment from Father and did not recall requesting that Father sign a release authorizing DCS to obtain a copy of the assessment. Additionally, Ms. Baker did not attempt to subpoena the record from Cumberland Heights or request that DCS issue a subpoena. She testified that in cases where DCS does not pay for the assessment she does not request supporting documentation. In her opinion, it was Father's sole duty to provide DCS with a copy of the assessment. We disagree. In cases such as this, it is vital that DCS obtain a copy of an addict's drug and alcohol assessment in order to supply the appropriate services. The suggestion that the addict parent has the sole responsibility to ensure that DCS's receives a copy of the provider's recommendations is untenable. Further, blind reliance on a drug addict to relay truthfully the steps needed to remedy his addiction and report truthfully his compliance with the recommendations of the assessment is unreasonable. Although Father candidly testified regarding the recommendations of his assessment and subsequent noncompliance in this case, we can certainly envision a scenario in which DCS's nonfeasance could produce disastrous results for either the addict's rehabilitation or DCS's ability to prove grounds for termination.

We find it equally troubling that Father did not receive a list of treatment facilities or counseling options, that Ms. Baker was not aware of anyone from DCS offering to pay for rehabilitation or drug counseling for Father, and that DCS ceded its responsibility to ensure that Father obtained treatment once he elected to undergo rehabilitation at Cumberland Heights. *See In re C.A.H.*, No. M2008-00005-COA-R3-PT, 2008 WL 3068430, at \*9 (Tenn. Ct. App. Aug. 1, 2008) (describing the provision of a list of treatment facilities, "a basic action" to help a drug addict overcome an addiction). In prior cases, we have recognized that DCS must do more than simply provide parents with a list of services and send them on their way. *See, e.g.*, *In re Chase A.C.*, No. E2009-01952-COA-R3-PT, 2010 WL 3257711, at \*18 (Tenn. Ct. App. Aug. 18, 2010) (*no perm. app. filed*) (citation omitted); *In re C.A.H.*, No. M2008-00005-COA-R3-PT, 2008 WL 3068430, at \*9; *In re Giorgianna H.*, 205 S.W.3d at 519. Thus, DCS's failure to so much as provide Father with a list of treatment services and counseling options was clearly unreasonable.

The totality of the evidence in the record fails to demonstrate clearly and convincingly that DCS made reasonable efforts to address Father's drug addiction. DCS employees have

an *affirmative* duty to help a drug-addicted parent become drug free, even if the parent does not ask for help. "In circumstances that do not involve serious physical abuse or harm to the child, the law does not permit the Department to be passive when it removes children from their parents' custody." *In re Tiffany B.*, 228 S.W.3d at 160. "The law requires the Department to bring its skills, experience, and resources to bear in a reasonable way to bring about the reunification of the family." *Id.* It was unreasonable for DCS to assume that Father, who has candidly acknowledged an addiction to methamphetamine and a need for inpatient treatment, would independently conquer his addiction where the only services DCS provided primarily (1) confirmed his serious addiction to methamphetamine and (2) confirmed his continued use of methamphetamine. DCS's duty extends beyond documenting the persistence of a parent's drug abuse for use at trial; it must take reasonable steps to remedy the problem and prevent termination of the parent-child relationship if possible. Although Father's recurring incarcerations may have impeded DCS's ability to provide the requisite services, DCS has not clearly and convincingly demonstrated that it exercised "'reasonable care and diligence'" in evaluating and delivering the services that Father needed. *In re C.A.H.*, 2008 WL 3068430, at *9 (quoting Tenn. Code Ann. § 37-1-166(g)(1)). We therefore reverse the decision of the juvenile court terminating Father's parental rights. All other issues are pretermitted.

## V. Conclusion

For the foregoing reasons, we reverse the decision of the juvenile court to terminate Father's parental rights. Costs of this appeal are assessed to the appellee, the Department of Children's Services, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

-15-