# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned On Briefs June 25, 2012

## IN RE: VYSIN C. G., URRYE E. G. AND ZYREN M. G.

**Direct Appeal from the Juvenile Court for Sevier County**
**No. 10001399, 10001400, 10001401      Jeffrey D. Rader, Judge**

**No. E2012-00375-COA-R3-PT - Filed August 1, 2012**

The trial court terminated Mother's parental rights based on abandonment for the failure to visit or support. On appeal, Mother asserts the trial court erred by determining that her failure to visit or support her children was willful. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Robert L. Huddleston, Maryville, Tennessee, for the Appellant.

Rolfe A. Straussfogel, Sevierville, Tennessee, for the appellees, Michael Odom, Ginger Odom, Charles Williams, Amy Williams and Elizabeth Seeley.

### MEMORANDUM OPINION[1]

This is a termination of parental rights case. On September 9, 2010, Petitioners Michael Odom (Mr. Odom) and Ginger Odom (Ms. Odom; collectively, "the Odoms"), Charles Williams (Mr. Williams) and Amy Williams (Ms. Williams; collectively "the Williams"), and Elizabeth Seeley (Ms. Seeley) filed a petition in the Juvenile Court for

---

[1]Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

Sevier County to terminate Mother's parental rights to Zyren M. G., born July 6, 2007; Urrye E. G., born June 20, 2008; and Vysin C. G., born June 11, 2009. In their Petition, the Odoms, the Williams and Ms. Seeley (collectively, "Petitioners") also sought to terminate the parental rights of the children's legal father, and to terminate the parental rights of the biological father of Vysin. The Odoms alleged that Vysin had been in their physical custody continuously since December 2009, and that he had been left in their custody sporadically from July 2009 to December 2009. The Williams alleged that Urrye had been in their physical custody continually since October 2009, and Ms. Seeley alleged that Zyren had been in her physical custody continually since October 2009. Petitioners asserted abandonment for the failure to visit, abandonment for the failure to support, abandonment for the failure to provide a suitable home, and persistence of conditions as grounds for the termination of parental rights. They also asserted that termination of parental rights was in the best interests of the children.

Following a hearing in December 2011, the trial court terminated the parental rights of Mother and the children's legal father, as well as the parental rights of the putative biological father of Vysin, based on abandonment for the failure to visit or support. The trial court also determined that termination of parental rights is in the children's best interest. On January 23, 2012, the trial court entered final judgment on the matter pursuant to Tennessee Rule of Civil Procedure 54.02. Mother filed a timely notice of appeal to this Court.

### *Issue Presented*

Mother presents the following issue for our review:

Whether the trial court properly found that [Mother] was not hindered from maintaining contact, visitation, or support for the three (3) minor children by the Petitioners (either individually or in concert) or the maternal grandmother, therefore thwarting any efforts by her to parent her children or, in the very least, not have abandoned her children.

### *Standard of Review*

We review the decisions of a trial court sitting without a jury *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates otherwise. *In Re: Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. R.App. P. 13(d). No presumption of correctness attaches, however, to a trial court's conclusions on issues of law. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000); Tenn. R. App. P. 13(d). Insofar as the trial court's determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent evidence of clear and convincing

evidence to the contrary. *In Re: M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005).

Tennessee Code Annotated § 36–1–113 governs the termination of parental rights. The Code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36–1–113(c)(2010). Accordingly, every termination case requires the court to determine whether the parent whose rights are at issue has chosen a course of action, or inaction, that constitutes one of the statutory grounds for termination. A parent may not be deprived of their fundamental right to the custody and control of their child unless clear and convincing evidence supports a finding that a statutory ground for termination exists and that termination is in the best interests of the child. Tenn. Code Ann. § 36–1–113(c)(2010). Although the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard, it does not require the certainty demanded by the "beyond a reasonable doubt" standard. *In Re: M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth. *Id.* Insofar as the trial court's determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent evidence of clear and convincing evidence to the contrary. *Id.*

The heightened burden of proof in parental termination cases requires us to distinguish between the trial court's findings with respect to specific facts and the "combined weight of these facts." *In Re: Michael C. M.*, No. W2010–01511–COA–R3–PT, 2010 WL 4366070, at *2 (Tenn. Ct. App. Nov. 5, 2010) (quoting *In Re: M.J.B .*, 140 S.W.3d 643, 654 n. 35 (Tenn. Ct. App.2004)). Although we presume the trial court's specific findings of fact to be correct if they are supported by a preponderance of the evidence, we "must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion." *Id.*

### *Discussion*

The Tennessee Code, in pertinent part, defines abandonment as follows:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i)(2010). Additionally, "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D)(2010). Section 36-1-102(1)(G) provides that "it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made." Further, every parent 18 years or older is presumed to know of their legal obligation to support their child. Tenn. Code Ann. § 36-1-102(1)(H)(2010).

In its order terminating Mother's parental rights, the trial court found that, in October 2009, the children resided with their maternal grandmother ("Grandmother") at Mother's request. The trial court further found that Grandmother placed the children in the care of Petitioners, and that Mother knew the children were placed in Petitioners' care. The trial court further found that Mother had executed powers of attorney in favor of Petitioners, and that Mother had "little, if any contact with the children from December 2009 through February 2010." The trial court found that, in December 2009, Mother contacted Ms. Seeley "at least once, if not more" to arrange to visit Zyren, but that Mother failed to visit at the arranged time. It further found that Mother had "ample opportunity to have contact with Zyren and his siblings had she chosen to do so."

The trial court also found that Ms. Williams had telephoned Mother in February 2010 to arrange a meeting to discuss Urrye, and that Mother failed to appear for the meeting. The trial court found that Mother had requested that the Odoms care for Vysin, that the Odoms had contact with Mother through February 2010, and that Mother did not contact the Odoms thereafter.

The trial court found that the testimony of all the witnesses was that Petitioners initially agreed to care for the children on a temporary basis, but that there had been no indication from Mother prior to the hearing of the matter that she had any willingness to parent the children. The court found that Mother had testified to "various medical conditions and other excuses that prevented her from being able to care for the children," and found

Mother not to be credible. The court stated that Mother had produced no medical records or other evidence, other than her testimony, to support her claims of various illnesses.

The trial court also found that Mother's testimony that she was prevented from seeing her children was not credible. The trial court found that Petitioners continued to reside at the same addresses and had the same phone numbers, that they had regular contact with Grandmother and each other, and that they maintained the same employment known to Mother. The trial court also found that Mother had provided no support for the children, and that there was "no credible indication in this record that the Mother has some impediment, physical, mental or otherwise, which would have prevented her from paying some support or attempting to support these children[.]" The trial court found that neither Petitioners, Grandmother or her family prevented Mother from visiting the children, and that the evidence demonstrated that, "particularly at the beginning, Mother['s] participation would have been welcomed by the Petitioners." The trial court determined that Mother's testimony was not credible, and that the evidence did not support her assertion that she was prevented from establishing a relationship with the children.

It is undisputed that Mother did not visit or support her children for the four consecutive months prior to September 9, 2010. In her brief, however, Mother asserts that such failure was not willful. Although she acknowledges that she voluntarily allowed the children to be placed with Petitioners, and that she executed powers of attorney in favor of Petitioners, she asserts that her ability to visit the children was "at the whims" of Petitioners. Mother asserts that she was working toward completing a degree that would allow her to work in the healthcare industry, and that she was involved in a stable relationship and had stable housing in Baltimore, Maryland. She asserts that the children were placed with Grandmother because Mother could not provide a stable home for them due to various medical problems, including "diagnosis of different forms of cancer," a bitter divorce from her husband, and the end of her relationship with Vysin's father. Mother asserts the children were then placed with Petitioners, that the Odoms and Ms. Seeley knew Grandmother through the Smoky Mountains Children's Home, and that the Williams were known by Grandmother's other children. She asserts that Grandmother and Petitioners "thwarted any and all efforts that [Mother] made to maintain contact" with the children. She asserts that, even if she had attempted to "intrud[e] upon [Petitioners] places of employment," she would not have been able to "accost" two of the Petitioners because she was not allowed on the campus of the Smoky Mountains Children's Home. She also asserts that her health was a factor in her inability to maintain custody of the children. Mother submits that she tried to contact her children, but that Grandmother would not provide Petitioners' telephone numbers or addresses, and would not permit Mother's sister to provide the information. She does not indicate attempts to provide support for the children, but submits that she was unable to give the children birthday or Christmas gifts because she could not locate them.

Despite Mother's assertions that she is now stable and able to care for her children, Mother offers nothing in her brief to support her contention that the trial court erred by finding that she willfully failed to support the children.

In order to find abandonment, the court must establish that a parent's failure to support or to visit was willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999). As we previously have observed, "[t]he willfulness of a parent's conduct depends upon the person's intent, and such intent is seldom capable of direct proof." *In re Adoption of Destiny R. D.*, No. M2011–01153–COA–R3–PT,2012 WL 1066496, at *7 (Tenn. Ct. App. Mar. 27, 2012)(citing *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005)). Accordingly, "intent must often be inferred from circumstantial evidence drawn from the parent's actions or conduct." *Id.* (citing *In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008). We afford great deference to the trial court's assessment of intent where it is based on the parent's demeanor and credibility as a witness. *Id.* (citing *In re D.L.B.*, 118 S.W.3d at 360, 367 (Tenn. 2003); *In re Z.C.G.*, M2000-02939-COA-R3-CV, 2001 WL 1262609 at *6 (Tenn. Ct. App. Oct. 22, 2001)).

As noted above, the trial court found Mother's testimony that Petitioners and Grandmother prevented her from seeing or contacting the children to be not credible. Upon review of the record, we cannot say the evidence is contrary to the trial court's determination. In her testimony at the December 2011 hearing of this matter, Mother testified that she worked part-time and was attending FORTIS Institute in Baltimore, Maryland. She testified that she had begun her studies at Walter's State Community College in Morristown, Tennessee; transferred to South College in Knoxville; and then transferred to Hagerstown Community College in Hagerstown, Maryland, before transferring to FORTIS in Baltimore. She testified that, when she placed the children in Grandmother's care, her life was in "pure chaos." Mother testified that she chose to leave her marriage, was "falling apart" emotionally and physically, and that she was diagnosed with ovarian, cervical and uterine cancer which had "turned into lower intestinal cancer as well." She testified that she had undergone twelve surgeries in addition to the deliveries of her children. Mother testified that she "battled trying to have Zyren," and that she had been told she could not have children due to her medical condition.

Mother testified that she knew the Odoms and knew Ms. Seeley and the Williams, and that she felt that she had made the right decision in allowing her children to be cared for by Petitioners while she "got [her] life together." She testified that she had voluntarily given Grandmother guardianship of the children, and that she never received contact information for Petitioners from Grandmother. She also testified that she had the contact information at one time, but changed phones, lost her phone, had a phone stolen, and broke a phone, and

that she lost the contact information. Mother testified that she had signed the powers of attorney in favor of Petitioners on December 30, 2009, and that she signed the papers in the midst of her home being robbed and her identification stolen.

When asked when she had undergone her twelve surgeries, Mother replied that she had one between the birth of Zyren and Urrye, and one between the birth of Urrye and Vysin, and one approximately six weeks after the birth of Vysin. Mother testified that she had attempted to visit her children "through [her] mother." She testified:

> there wasn't any [contact], other than what I was making with my mother and what I assume [Petitioners] were making with my mother as well. I think when it comes to the contact issues, that was more on my mother's shoulders than it was mine or theirs. I think that she — she saw me getting scared, feeling like they were being tooken from me so I was trying to get them back immediately and I figured I would just somehow someway do it on my own versus being where I am right now. So she refused to give me any information or would tell me she didn't have it and also would not allow any of my other siblings to release any of the information they had.

Mother also testified that she did not have Petitioners' addresses, and that she asked Grandmother to arrange meetings but "it didn't happen." Mother testified that she was now able to care for the children, and that her fiancé was willing to help care for them.

Upon cross-examination, Mother testified that Grandmother was the "main reason" for her lack of contact with the children, but that she was "in the hospital for a very long time off and on" and had left the State of Tennessee. She also testified to facing "threats of being arrested" and "a lot of other reasons." When asked about the twelve surgeries, Mother stated that they occurred at "numerous hospitals, but more mainly in Fort Sanders." She testified that she had six surgeries within a month and a half following the birth of Vysin. Mother further testified that she had one surgery "almost per day."

Mother testified that she spent New Year's Eve 2010 in Maryland, and that she moved permanently to Maryland sometime in early 2010. She testified that she did not have the phone number for the Smoky Mountains Children's Home, and that she did not try to call Ms. Odom or Ms. Seeley there because "[t]hat's not where [the] children reside." Mother testified that she did not have her medical records with her. When asked whether she signed the papers granting power of attorney to the Williams and Ms. Seeley, Mother replied: "No, yes, I did sign them but they were intended for my mother."

Mother further testified that she had spoken to the Odoms, the Williams and Ms.

Seeley at some point, but that she had lost their phone numbers. Mother testified that she did not intend to take her "children from [Petitioners] completely," but that she would like to "have [them] back." Mother testified that all but her lower intestinal cancer was in remission, and that she was being treated at Johns Hopkins. She testified that she would graduate "in a few months" and that she was "doing very fine for [her]self." Mother testified "I'm not struggling for anything and my bills are all paid. I'm not in debt."

Mother denied having contacted counsel for Petitioners, asserting that it was her sister who had contacted counsel and relayed information. She further testified that she had no contact with Vysin's father until he contacted her regarding the current action, and stated that she "drove to Knoxville and hunted him down the best way [she] could . . . I found him, I made contact with him." Mother testified that she "had inquired with numerous lawyers in the DMV area" regarding the process of having the children returned to her custody, but had not spoken to an attorney in Tennessee.

Mother testified that she felt threatened because Mr. Odom is a police officer and that "[i]t's common knowledge" that he "might have a little pull." She testified that she had previously had difficulties with prescription medication, but that she was now seeking "alternative treatment, more herbal and natural treatments" for her medical problems. Mother testified that she had no impairments that would cause her to be unable to care for her children.

Mr. Odom testified that Vysin's father had visited two to five times, and that he had Mr. Odom's cell phone number, which had not changed. Mr. Odom further testified that he had never been offered support for Vysin. He testified that he had never threatened Mother, directly or indirectly. Ms. Odom testified that in 2009 Mother would "call sporadically" and that Vysin's father had some contact with Vysin in 2009. She further testified that Mother and Mr. Odom "talked frequently initially," that Mr. Odom helped Mother find a place to live in Sevierville and offered to help her move from Knoxville, and that Mother "just never followed through with anything." Ms. Odom testified that, in December 2009, Mother telephoned around midnight to say that she "couldn't handle" the boys and was "getting out of town." She stated that Mother telephoned them in early 2010, and that Mother stopped contacting them in January or February 2010. Ms. Odom testified that Mother had the Odom's telephone number and knew how to contact them. She testified that neither her cell phone number nor Mr. Odom's had changed. Ms. Odom also testified that she was employed at the Children's Home, and that Mother would have been able to contact her there. Ms. Odom testified that Mother knew how to contact her at the Smokey Mountains Children's Home, stating that Mother "grew up at the Children's Home for several years. She lived there." Ms. Odom testified that the Odoms had received no support for Vysin other than a diaper bag that contained three or four diapers.

Ms. Seeley testified that in November 2009 Mother returned from Maryland to visit, and that in December 2009 Mother called her and asked if she could "drive by and give Zyren a quick hug and kiss," but that Mother "didn't show." She testified that she tried to call Mother back, but that Mother did not answer. Ms. Seeley testified that she had retained the same telephone number. She also testified that Mother had not contacted her since 2009, and that Mother had not offered any financial support. Ms. Seeley testified that Mother gave Zyren a new outfit for Thanksgiving 2009, but had provided no other gifts or support. Ms. Seeley testified that she had not prevented Mother from visiting.

Ms. Williams testified that she did not know Mother when Urrye first came into her care, but that she met her at Thanksgiving 2009. She testified that Mother knew where Urrye was, that several visitation dates had been arranged, but that they were canceled at the last minute. Ms. Williams testified that she telephoned Mother directly from her telephone in February 2010 to arrange a visit, that she spoke with Mother, gave Mother her telephone number, and "had a good conversation" with Mother. She testified that they arranged a meeting for the following day, but that Mother was unable to meet as planned. Ms. Williams further testified that she had not received any financial support or gifts for Urrye other than an outfit at Thanksgiving 2009.

Mother's sister testified that Grandmother instructed her not to give Petitioners' contact information to Mother because Grandmother thought "it really wasn't safe." Mother's fiancé, Anthony Wear (Mr. Wear), testified that Mother had called her family to obtain Petitioners' phone numbers, but that Mother's family would not provide the information. He testified that Mother purchased holiday and birthday gifts for the children, but could not deliver them because she did not know where the children were. Mr. Wear testified that he did not know whether Grandmother had contact with Smoky Mountains Children's Home, and that he had never heard of the home. He testified that he was aware that Mother knew the names of Petitioners. He testified that he and Mother did not live together, but that Mother maintained a separate residence.

"A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)(citation omitted). Based on the record before us, it is clear that Mother made no attempt to contact her children other than asking Grandmother for Petitioners' contact information. Grandmother's refusal to provide Mother with Petitioners' contact information does not constitute a "significant restraint or interference." Additionally, the trial court found Mother's testimony regarding her health not to be credible, and there is no evidence in the record, other than Mother's testimony, to demonstrate that Mother had serious medical issues that would have prevented her from visiting her children. It is also clear that Mother made

no attempt to support her children, despite her testimony that she is stable financially and without debt, and Mr. Wear's testimony that Mother maintains her own home.

In her brief, Mother asserts that she "believes" the trial court erred in finding that termination of her parental rights is in the best interests of her children. She chooses not to argue this issue on appeal, however, stating that it "would be a moot exercise" if "it was shown . . . that her failure to visit and failure to support were not willful." In light of our holding here, however, we have reviewed the trial court's determination that termination of Mother's parental rights is in the children's best interest. Upon review of the entirety of the record, we find that clear and convincing evidence supports the trial court's determination.

### *Holding*

In light of the foregoing, we affirm termination of Mother's parental rights based on abandonment for failure to visit or support. This matter is remanded to the trial court for enforcement of the judgment and the collection of costs. Costs of this appeal are taxed to the Appellant, and her surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE